**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

B.F.,                                          :
a minor child, by and through                  :
P.F. and R.F., parents as next friends,        :
                                               :
       Plaintiff,             :    CIVIL ACTION NO.
                                               :    1:04-CV-3379-JOF
       v.                     :
                                               :
FULTON COUNTY SCHOOL                           :
DISTRICT,                                      :
                                               :
       Defendant.             :

**OPINION AND ORDER**

This matter is before the court on Defendant's motion for leave to file excess pages [74]; Defendant's motion for summary judgment [75]; Plaintiff's motion for leave to file excess pages [76]; Plaintiff's motion for summary judgment [77]; Plaintiff's motion for judgment [78]; the parties' joint motion for clarification [79]; Plaintiff's motion for leave to file excess pages [82]; Defendant's motion for leave to file excess pages [83]; and Defendant's motion for leave to file excess pages [85].

## I.    Background

### A.    Procedural History

Plaintiff, B.F., a minor child, by and through his parents, P.F. and R.F., filed this suit against Defendant, Fulton County School District, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq*., and section 504 of the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794, claiming that the Fulton County School District has not provided B.F. with a Free and Appropriate Public Education.  B.F. primarily challenges the services provided by Fulton County during the 2003-04 school year while B.F. was in attendance at Elkins Pointe Middle School.  Plaintiff also raises a claim under 42 U.S.C. § 1983.  Plaintiff sought a due process hearing before an administrative law judge pursuant to 20 U.S.C. § 1415(f).

The Administrative Law Judge conducted a hearing over six non-consecutive days in May and June 2004.  The following witnesses testified:  Larry Weiner, Director of North Metro Psychoeducational Program; Nancy Shelley, Executive Director of Services for Exceptional Children (Fulton County); Dr. Jonathan Lauter, B.F.'s treating psychologist; B.F.'s mother, a practicing child psychologist; Dr. Kathleen Platzman, a psychologist who evaluated B.F.; Dottie Pettes, the school district's lead administrator on B.F.'s case; B.F.'s father; three of B.F.'s teachers; David Nelson, Director of the middle and upper school of Lionheart; Liz Novak, Coordinator of the North Metro Pyschoeducational Program at Elkins

2

Pointe Middle School; as well as Phyllis Fantozzi, an aide to B.F. during 2003-04 school year; Kahyati Patel; David Ferster; Debra Cohn, an interrelated special education teacher at Elkins Pointe; and Bonnie Bennett Alley.

On September 2, 2004, the Administrative Law Judge issued an order finding that the Fulton County School District had provided B.F. with a Free and Appropriate Public Education ("FAPE") and that the parents' placement of B.F. in a private school was not appropriate under 20 U.S.C. § 1412(a)(10)(C). Therefore, the Administrative Law Judge denied Plaintiff's request for compensatory services, reimbursement for all private services and evaluations, and placement in a private school for the 2004-2005 school year. Plaintiff then filed the instant complaint in this court.

The court first ruled on Plaintiff's motion to submit additional evidence. Finding that Plaintiff could present one supplemental witness, the court set down an evidentiary hearing for August 2, 2006. The August 2, 2006 hearing never took place, however, because Plaintiff filed a motion for a continuance based on the unavailability of Dr. Lauter. No further action was taken in the case for nearly one year. In a November 7, 2007 order, the court denied Defendant's motion to dismiss for lack of prosecution but did direct Plaintiff to submit three potential dates for a new deposition of Dr. Lauter. Dr. Lauter was deposed on December 21, 2007, and Plaintiff filed the deposition transcript with the court on

3

February 21, 2008. The court then directed the parties to file motions for summary judgment, as understood in the context of the IDEA.

## B.    IDEA Background

The IDEA creates a federal grant program to assist state and local agencies in educating disabled children. *See Cory D. v. Burke County School District*, 285 F.3d 1294, 1295-96 (11th Cir. 2002). The IDEA guarantees students a Free and Appropriate Public Education ("FAPE"). *See Loren F. v. Atlanta Independent School System*, 349 F.3d 1309, 1311-12 (11th Cir. 2003); *School Board of Collier County v. K.C.*, 285 F.3d 977, 979 (11th Cir. 2002). A Free and Appropriate Public Education is defined as special education services that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education programs required under section 1414(d) . . . .

20 U.S.C. § 1401(8). Under the IDEA, the cost of a private school may be reimbursed if the public school did not make a Free and Appropriate Public Education available to the child in a timely manner. *Id.*, § 1412(a)(10)(C)(ii). "To provide a FAPE, a school formulates an Individual Educational Plan ("IEP") during a meeting between the student's parents and school officials. An IEP must be amended if its objectives are not met, but perfection is not

4

required." *Loren F.*, 349 F.3d at 1312 (quotations and citations omitted).  In evaluating whether a student has received a FAPE, courts "ask whether:  (1) the school complied with the IDEA's procedures; and (2) the IEP developed through those procedures is reasonably calculated to enable the student to receive educational benefits." *Id.* (quotations and citations omitted).  "To ensure children with disabilities and their parents are guaranteed procedural safeguards with respect to each IEP, the IDEA requires states to establish, and abide by, certain measures." *Cory D.*, 285 F.3d at 1296 (citing 20 U.S.C. § 1415(a)).

The Eleventh Circuit has cited various authorities to flesh out the determination of whether a child has received "educational benefits." *Loren F.*, 349 F.3d at 1312 n.1 ("The FAPE described in an IEP need not be the best possible one . . . rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Pace v. Bogalusa City School District*, 325 F.3d 609, 618-19 (5th Cir. 2003)); *JSK v. Hendry County School Board*, 941 F.2d 1563, 1573 (11th Cir. 1991) ("While a trifle might not represent 'adequate' benefits . . . maximum improvement is never required"); *E.D. v. Enterprise City Board of Education*, 273 F. Supp. 2d 1252, 1263 (M.D. Ala. 2003) ("[A] denial of a FAPE is difficult to establish. The standard for whether an IEP provides a FAPE is whether it is reasonably calculated to confer the basic floor of educational benefits."). The Supreme Court held in *Rowley* that the IDEA does not require the maximization of a student's potential, but rather only that the IEP

5

provide a "basic floor of opportunity." *See Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 198 (1982). A school district does not guarantee a particular outcome. *Id.* at 192.

Whether an IEP provides a FAPE is a mixed question of fact and law subject to de novo review. *Loren F.*, 349 F.3d at 1313. Summary judgment is based on a preponderance of the evidence and may be granted even where there are facts in dispute. *Id.* The usual summary judgment principles in Federal Rule of Civil Procedure 56 do not apply. *Id.*[1] In reviewing an administrative law judge's decision, "due weight" should be given to the determinations made during the administrative hearing. *See Rowley*, 458 U.S. at 206. The court must consider the administrative findings of fact, but has the discretion to accept or reject them. *Doe v. Alabama State Department of Education*, 915 F.2d 651, 657 n.3 (11th Cir. 1990); *Jefferson County Board of Education v. Breen*, 853 F.2d 853, 857 (11th Cir. 1988). In determining whether a student has received adequate educational benefit, the

---

[1]In an order dated February 25, 2008, the court set down a briefing schedule for the parties' motions for summary judgment in an IDEA case as described by *Walker County School District v. Bennett*, 203 F.3d 1293 (11th Cir. 2000), and *Loren v. Atlanta Independent School System*, 349 F.3d 1309 (11th Cir. 2003). The court directed the parties "to file cross-motions for summary judgment within twenty (20) days from the date of this order. The parties may then respond to each other's motion within ten (10) days after the submission of the original motions." *See* Order, dated Feb. 25, 2008, at 2. The parties then filed a motion for clarification asking whether they could respond to each other's statement of facts. Before the court answered the motion, the parties filed their response briefs and responses to statement of facts. Therefore, the court DENIES AS MOOT the parties' joint motion for clarification [79].

6

court should give "great deference" to the educators who developed the IEP. *See JSK*, 941 F.2d at 1573. In *Schaffer v. Weast*, 546 U.S. 49 (2005), the Supreme Court established that in an administrative challenge to a student's IEP, the burden of proof rests with the challenging party; in this case, B.F. and his parents. *Id.* at 57-58.

### C. Facts

B.F. was thirteen years old at the time of the administrative hearing. He has been diagnosed with attention deficit hyperactivity disorder, anxiety disorder, and Kallman's Syndrome, a genetic condition that causes anosmia (inability to smell), a lack of depth perception, and synkinesis (mirror movements). In the fall of 2003, Dr. Kathleen Platzman, a licensed psychologist, also diagnosed B.F. with Asperger's Syndrome. DSMF, ¶ 1. At some point in late 2003 or early 2004, Dr. Jonathan Lauter, a psychologist retained by B.F.'s parents, diagnosed B.F. with Post Traumatic Stress Disorder. PSMF, ¶ 10.

B.F. first entered the Fulton County School District in the 2000-01 school year as a fourth grader. Prior to this, he had been home schooled, in part by his mother, Dr. F, who is a child, adolescent, and adult psychiatrist in private practice. DSMF, ¶ 2. B.F. had been identified as eligible for special services during the 2000-01 school year. DSMF, ¶ 3. B.F. received an IEP and was placed in a self-contained learning disability classroom at Alpharetta Elementary School. DSMF, ¶ 4. B.F. was not behaviorally successful in the classroom, and in September 2000, B.F.'s IEP team agreed that he should be placed in the

North Metro Psychoeducational Program at Sweet Apple Elementary School.  DSMF, ¶ 5.

Liz Novak, Coordinator of the North Metro program at Sweet Apple, worked with B.F. one-

on-one when he transferred into the program.  DSMF, ¶ 7.  Various behavioral techniques

were used to help B.F. adjust to the structure and setting of a school.  *Id.*  B.F. began to

make progress.  DSMF, ¶ 8.  B.F.'s IEP was modified again in January 2001.  DSMF, ¶ 9.

At the end of the school year in May 2001, B.F.'s IEP was again modified to take into

account progress he had made during the school year and open up other areas for

improvement.  DSMF, ¶ 10.  The IEP determined that B.F. should continue in the program

at Sweet Apple.  *Id.*

For the 2001-2002 school year (fifth grade), it was determined that B.F. would be

mainstreamed with his nondisabled peers for lunch, home room, physical education, and

math.  DSMF, ¶ 11.  In January 2002, at a meeting that included B.F.'s parents, music,

chorus, and science were added to B.F.'s mainstreamed classes.  *Id.*  At that same meeting,

the group discussed B.F.'s reliance on Ms. Phyllis Fantozzi, an aide with the North Metro

program, who assisted B.F. in his regular education classes.  DSMF, ¶ 12.  The team noted

that she should continue to try to wean her presence away from B.F. so he could be more

independent.  *Id.*  B.F.'s transition to Elkins Pointe Middle School was also discussed.  *Id.*

Ms. Fantozzi was to take B.F. to the school in the spring for orientation so he could

successfully transition to a new environment.  *Id.*

8

Ms. Fantozzi testified that Ms. Novak was instrumental in designing B.F.'s North Metro program.  *Id.*  By all appearances and contemporaneous documents, B.F. did not express any fear of Ms. Novak, and B.F.'s family had a positive working relationship with Ms. Novak and the staff of North Metro at Sweet Apple.  DSMF, ¶ 15.

On May 16, 2002, B.F.'s IEP team, including his parents, met to develop an IEP for the 2002-03 school year (sixth grade).  DSMF, ¶ 16.  B.F. was doing well academically in language arts and math.  *Id.*  The greatest concern was B.F.'s anxiety.  *Id.*  He was worried about fitting in with middle school students.  *Id.*  The group wanted B.F. to work on independence skills and to be using his agenda all of the time by the end of the year.  *Id.* B.F.'s father, Mr. F, wanted B.F. to work on note taking skills.  *Id.*  For sixth grade, it was determined that B.F. would spend most of his day in a self-contained class with high levels of support for his anxiety.  DSMF, ¶ 17.  He was to be in a mainstreamed math class, as well as "Connections" which are exploratory classes such as art and music.  *Id.*  He would continue to have sixty minutes per week of speech and language services, as well as occupational therapy for thirty minutes per month.  *Id.*

Over the summer break, B.F.'s parents had B.F. evaluated by Dr. Mary Grace Thomas, a private psychologist.  DSMF, ¶ 18.  She agreed that B.F. was capable of regular education academic expectations, but that his days would have to be carefully planned.  *Id.* She recommended that B.F. use a computer for developing written assignments, that he be

9

taught study skills including organization and time management, and that he could have a quiet location to go to in order to complete assignments. *Id.* On August 1, 2002, the IEP team met again to consider Dr. Thomas' recommendations and the parents' requests concerning regular education classes. DSMF, ¶ 19. B.F.'s IEP was amended to add regular education science to his schedule. *Id.* Fulton County also agreed to reevaluate B.F. for an AlphaSmart or laptop computer for word processing and to make a room in the North Metro hall at Elkins Pointe available for B.F. if he became anxious. At the request of B.F.'s parents, the IEP team added a behavior objective. *Id.* At this meeting, B.F.'s mother, Dr. F., informed the IEP team that B.F. wanted to transition out of the North Metro program. DSMF, ¶ 22. Thus, at the beginning of the school year, B.F. was in regular education math, science, chorus, physical education, and Connections classes and attended lunch with his nondisabled peers. *See* DSMF, ¶ 20. He received social skills training in his regular education class and was accompanied to all classes by an aide from North Metro. *Id.*

Within four weeks of the start of school, B.F.'s parents had four meetings with school staff. DSMF, ¶ 24. These meetings involved issues such as B.F.'s assistant, what textbooks B.F. had available, and the structure of the agenda that B.F. was to use each day. *Id.* B.F.'s parents also expressed concern about B.F.'s anxiety and organizational skills. DSMF, ¶ 26. The school agreed that B.F.'s aides would make sure that his assignments were written down, and that B.F. had all assignments, agendas, and point sheets before he got on the bus

10

at the end of the day. *Id.* The teachers in B.F.'s regular education classes would communicate his daily progress to the assistants who would forward it to the parents. *Id.* At the third meeting, B.F.'s parents expressed concern about B.F. being harassed by another student and asked that the daily point sheet be changed because the parents did not feel it was providing adequate information. DSMF, ¶ 27. The school altered the daily point sheet to show Antecedent, Behavior, and Consequence data. *Id.* The staff would encourage B.F. to tell them when he felt threatened or teased, and B.F.'s special education teacher would work with him on social skills in this situation. *Id.* The school also agreed to talk to the parents of the student who allegedly harassed B.F. *Id.* The last conference addressed B.F.'s anxiety which would lead to "meltdowns" and cause B.F. to pull his hair and become argumentative. DSMF, ¶ 28. Dr. Cynman, B.F.'s psychiatrist, attended this conference and suggested that there be more consistency and structure in the way B.F.'s meltdowns were handled. *Id.* The school agreed that Andrea Rinaldi, a North Metro staff member, would do a functional behavioral assessment on B.F. *Id.*

The IEP team met again two times in October. *See* DSMF, ¶ 29. B.F. was performing well academically in math and science and doing behaviorally well in chorus. *Id.* Because of this, the IEP team added regular education to all academic classes. *Id.* B.F. did not have a full-time assistant in chorus or science, as science was team-taught by a special education teacher. *Id.* At these meetings, B.F.'s parents expressed concern about

11

his anxiety and inability to be organized. *Id.* In response to a large list of accommodations requested by his parents, the school agreed to have a categorical assistant accompany B.F. to all classes. *Id.* The school also agreed that copies of his teachers' notes would be supplied to the parents daily; B.F. would be given two sets of textbooks, one for home and one for school; he could go to North Metro to calm himself if he became anxious; assignments and tests would be broken down into small chunks; study guides would be provided prior to tests and quizzes; and B.F.'s homework assignments would be written down in his planner. *Id.* The IEP team discussed the eventual goal of having B.F. be able to attend classes without an aide. DSMF, ¶ 30. The team also discussed how to positively reinforce good behavior, consistently use the point sheet, and allow B.F. to use a complaint form when a student/teacher situation was bothering him. DSMF, ¶ 31. Strategies were discussed for teachers to use when B.F. had a meltdown in an attempt to get B.F. to make choices and take control and responsibility for his behavior. *Id.*

At a December 2002 IEP meeting, adjustments were made to the amount of math homework, and strategies were discussed to get B.F. to participate in group projects. DSMF, ¶ 32. B.F. had moved to having lunch in the Metro North area, and he seemed to have less in anxiety in the afternoon as a result of this. *Id.* B.F.'s categorical assistant was starting to try to remain in the back of the classroom to encourage B.F.'s independence. *Id.* B.F. began using the AlphaSmart laptop for his language arts classes. DSMF, ¶ 33. During

the 2002-03 school year, B.F. received all As and Bs in his classes and did particularly well socially in chorus class, even singing in front of his classmates. DSMF, ¶¶ 34-35. He received scores in the highest performance level on the Georgia Criterion Referenced Competency Tests (CRCTs). DSMF, ¶ 36.

B.F.'s father testified that he thought the sixth grade year had started poorly and that B.F. has significant anxiety about school, the program, and his peers. PSMF, ¶ 15. Mr. F. believed that while B.F. got good grades, these were "propped up" because he was allowed to redo homework assignments and his assistant had "mucked up" some assignments that B.F. had to re-do. *Id.* & Resp., PSMF, ¶ 15.

In preparation for the 2003-04 school year, the IEP team met on May 8, May 22, and July 9, 2003, to develop B.F.'s IEP. DSMF, ¶ 37. In May 2003, Dr. Selig Cynman, B.F.'s treating psychiatrist, sent a note to Arthur Reitz, B.F.'s case manager, stating that B.F. did have some symptoms of Asperger's Syndrome and "[f]urther evaluation is necessary to determine whether he in fact has Asperger's Syndrome." PSMF, ¶ 14, Plaintiff's Exh. 55.

For the purpose of providing context for the further discussion, it appears that it was during the drafting of the IEP for the 2003-04 school year that B.F.'s parents and the school staff began to have conflicts over B.F.'s proposed program. Two documents appear in the record of the case at R40 and R41 which purport to represent the IEP for B.F. R41 is the school district's minutes from the meeting; R40 is that same document with notes

13

handwritten by B.F.'s father. There is no evidence in the record that the school district ever received R40 or agreed to the notes handwritten by Mr. F.

At the first IEP meeting, Mr. F. presented a written statement to the team discussing B.F.'s anxiety, his concerns about the amount of homework, and his problems in changing routine. DSMF, ¶ 39. He was also concerned about B.F.'s social skills and inability to interpret social cues. *Id.* Mr. F. noted that it was positive that B.F. had progressed from eating in Metro North to eating in the school's cafeteria. *Id.* The team also discussed a desire on the part of the staff not to always have an assistant in the classroom to work with B.F. because he would rely on the assistant too much. DSMF, ¶ 40. At the May 8 meeting, the IEP team worked on B.F.'s academic needs and pragmatic language deficits. DSMF, ¶ 41. B.F.'s parents deny these goals or objectives were ever completed. Resp. to DSMF, ¶ 41. On May 22, B.F.'s parents discussed with staff B.F.'s anxiety. DSMF, ¶ 42. The staff was concerned that B.F.'s parents were addressing instructional strategies as opposed to B.F.'s behavior. *Id.* Over May 22 and July 9, the IEP team agreed that B.F. should improve his social interaction with others, increase his on-task behavior in all settings, and to increase his ability to manage stress and anxiety. DSMF, ¶ 43. B.F.'s parents believed that these goals would be further addressed by the IEP in October after viewing B.F.'s performance to that time. Resp. DSMF., ¶ 43.

The short term objectives on improving social interaction would be to have B.F. recognize social cues to end a conversation, demonstrate active listening/appropriate turn-taking, initiating greetings with peers, initiating situationally appropriate conversation, responding to peers' comments in an appropriate manner, and maintaining the appropriate level of volume and distance in a conversation. DSMF, ¶ 44. The short term objectives for increasing on-task behavior were that B.F. would pay attention to the teacher when he or she was speaking, following the routine of the classroom from beginning to end, maintaining an agenda in a portable word processor by copying assignments as written on the board or provided by the teacher, and placing all paperwork in the appropriate sections of an organizational system. DSMF, ¶ 45. With respect to B.F.'s stress and anxiety, the short term objectives were to increase self-management with a behavioral intervention plan, increase self-management through independent use of strategies as defined by the behavioral intervention plan, and identify and label triggers, stressors, and patterns. DSMF, ¶ 46. Whether the school district provided a behavioral intervention plan for B.F. is one of the major areas of dispute B.F.'s parents have with the school district's performance. However, not all of the social and behavioral goals and objectives for B.F. referred to a behavioral intervention plan. PSMF, ¶ 17 & Resp.

At the July 9, 2003 IEP meeting, B.F.'s parents proposed an extensive list of accommodations, of which the school district agreed to implement twenty-two. DSMF, ¶ 47

15

(outlining the accommodations). The team also discussed how B.F. would record his homework assignments. DSMF, ¶ 48. The staff wanted B.F. to be able to record the assignments himself in his planner because that is what his peers were doing. *Id.* B.F.'s parents wanted the assistant to continue writing the assignments and work toward a more gradual transition. *Id.* The staff suggested that B.F. attempt to write the assignments and a staff member would then e-mail the assignments to B.F.'s parents each day. *Id.* Mr. F. rejected that proposal. *Id.*

B.F.'s parents did not want B.F. placed in any North Metro hall classrooms and wanted him in regular classes with a full-time assistant. DSMF, ¶ 49. The staff was concerned about B.F.'s independence and ability to learn self-management skills while in a regular classroom. *Id.* It was decided that B.F. would be administratively assigned to the North Metro Psychoeducational Program but would have placement in all regular education classes including language arts, pre-algebra, Spanish, team-taught social studies, and science. DSMF, ¶ 50 and Resp. It was also agreed that B.F. would start the year with a full-time assistant, but that prior to the second nine weeks, the IEP team would meet again to begin setting up a transitional plan for B.F. with the goal of him having no assistant by the fourth nine weeks of school. *Id.* The IEP team agreed that B.F.'s social interaction goal and objectives would be worked on with a speech therapist who would provide two hours of

16

service a week divided into daily segments. DSMF, ¶ 52. The team also decided that an AlphaSmart system would be more beneficial than a lap-top. DSMF, ¶ 53.

The IEP team agreed to occupational therapy services for .10 hours per month. DSMF, ¶ 55. The staff interpreted this as the occupational therapist observing B.F. twice a semester and working with B.F.'s regular educational teachers on a consultative basis to work with B.F.'s sensory stressors. *Id.* B.F.'s parents disagree that the twice a semester plan was agreed to and assert that B.F. received no services from the occupational therapist. *Id.* & Resp.

At the May 22, 2003 meeting the IEP team discussed the fact that B.F.'s behavior impeded his learning process, and this was to be a factor addressed through the IEP. DSMF, ¶ 56. As part of this, the team also discussed that Andrea Rinaldi would be drafting a behavioral intervention plan for B.F. for the 2003-04 school year, as she had done for the 2002-03 school year. DSMF, ¶ 57. She was to present the plan at the next IEP meeting, but prior to that meeting Ms. Rinaldi had surgery. *Id.* At the July 9, 2003 meeting, in Ms. Rinaldi's absence, the parents were informed that Ms. Rinaldi would start from the plan she had drafted in the sixth grade and combine that with the parents' input. *Id.* B.F.'s parents did not object to this. *Id.*

B.F.'s parents were also told at the July 9 meeting that Liz Novak would be the new coordinator of the North Metro program at Elkins Pointe Middle School. DSMF, ¶ 59. She

17

attended a portion of the July 9 meeting, and B.F.'s parents greeted her enthusiastically noting that B.F. had worked with Ms. Novak at Sweet Apple Elementary School. *Id.* Mr. F. sent Ms. Novak an e-mail congratulating her on the new position and stating that he and Dr. F. were pleased that she was taking over the program. *Id.* B.F.'s parents testified that they did not believe Ms. Novak to be competent and that their greetings of her were only a reflection of their efforts to respectfully work with the school system. Resp., DSMF ¶ 59. For the state of the record, the important point for the court is that Ms. Novak and the school district did not have any idea at this stage that the parents were dissatisfied with Ms. Novak or believed her to be incompetent or a threat to B.F.

On August 6, 2003, Mr. F. and Dr. F. met with B.F.'s teachers for the 2003-04 school year, providing them with a three-page letter on B.F.'s disabilities and behaviors. DSMF, ¶ 60. Mr. F. explained how he believed B.F. should be treated and how the staff should react to him. *Id.* The teachers found the session helpful. *Id.* Jim Griffin was a paraprofessional slated to be B.F.'s categorical one-on-one assistant for the 2003-04 school year. DSMF, ¶ 61. The school year started on August 11. DSMF, ¶ 62. Arthur Reitz, a special education teacher with the North Metro program and B.F.'s special education case manager, e-mailed Mr. F. that day to say B.F. was doing well. *Id.* Because Mr. Griffin was receiving training on Asperger's Syndrome, B.F.'s assistant for that day was Rebekah Bouldin, a paraprofessional who had worked with B.F. at Sweet Apple. *Id.*

Mr. F. communicated with the staff on the second day of school saying that the student planner provided by the school was not functional because the lines were too small and asking to be involved in deciding what planner should be used. DSMF, ¶ 63. He also stated that the afternoon bus arrived home too late because B.F.'s medications wore off by the time he got home from school. *Id.* Mr. F. reported that he was pleased with Ms. Bouldin's work as B.F.'s assistant. DSMF, ¶ 64. Several days later, Mr. F. reported to Ms. Novak that B.F. had gotten off to a good start in the school year because Ms. Bouldin was well organized. *Id.*

By the fourth day of school, Mr. F. wrote to Mr. Reitz to say that Mr. Griffin was unacceptable as an assistant because he caused B.F. to go from being organized to being in chaos in one day. DSMF, ¶ 65. Mr. F. stated that Mr. Griffin should not continue another day as B.F.'s assistant and that he was a terrible match for B.F. socially, organizationally, and academically. *Id.* Mr. F. stated that Mr. Griffin was "below the bar" and that it would be ludicrous to have any further involvement with him. *Id.* Mr. F. sent an e-mail to each of B.F.'s regular education teachers noting his views of Mr. Griffin's performance. *Id.* Ms. Novak told Mr. F. that she would not remove Mr. Griffin as B.F.'s assistant. *Id.* Mr. F. responded that he was "not used to being nor was [he] willing to be dictated to, pushed aside, or cut out of the loop." *Id.* He also stated that he should be the individual to work with the new assistant and get that person up and running. *Id.* During this August 14

AO 72A
(Rev.8/82)

communication, Ms. Novak also explained to B.F.'s parents the home school communication checklist the school would provide daily, as well as a separate weekly report. DSMF, ¶ 67. Mr. F. stated that he was the one who was supposed to work with the assistant to provide the communication log. *Id.*

The next day, Ms. Novak wrote to Mr. F. asking that he copy her, Mr. Reitz, and Dottie Pettes, a Fulton County administrator, on communications to the staff so that they could be kept up to date on his concerns and follow up. DSMF, ¶ 68. On that date, Mr. F. also requested from Ms. Novak a complete copy of B.F.'s educational records. DSMF, ¶ 69. Ms. Novak got these records and Mr. F. received them on August 24. *Id.* Mr. F. had previously requested the records on July 2, 2003, in an e-mail to Mr. Reitz and Debbie Wright, the former social worker in the North Metro program at Elkins Point. *Id.* However, neither Mr. Reitz nor Ms. Wright was at their school e-mail addresses over the summer and did not receive the request. *Id.* During the course of July, Mr. F. was informed that Mr. Reitz would return in August and Ms. Wright at the end of July. *Id.*

During the second week of school, school staff organized B.F.'s notebooks to coincide with each half of his school day. DSMF, ¶ 71. Mr. F. returned the notebooks to school having reorganized them as before. *Id.* Staff also developed an agenda suited to B.F.'s fine motor skills so he could write in it himself. *Id.* Mr. F. told B.F.'s assistant that the agenda was not acceptable. *Id.*

At this time, B.F.'s case manager was switched from Mr. Reitz to Ms. Novak. DSMF, ¶ 72. The school staff felt that the amount of communication Mr. F. was sending from home was taking Mr. Reitz away from his classroom and instructional time. *Id.* Mr. F. testified that Ms. Novak purposefully removed Mr. Reitz as case manager because she did not want him communicating with B.F.'s parents. Resp., DSMF, ¶ 72. Further, Mr. F. testified that at this time, B.F. was returning home from school crying and upset each day and that Mr. F. believed this was because there was no behavioral intervention plan in place for B.F. *Id.* There is no evidence in the record, however, to support this causation theory.

On September 2, 2003, Ms. Rinaldi sent a draft behavioral intervention plan to B.F.'s parents and asked for their input. DSMF, ¶ 74.

On September 4, 2003, Ms. Novak and Ms. Pettes met with B.F.'s parents to discuss their concerns with the first weeks of school. DSMF, ¶ 75. The school agreed to remove Mr. Griffin as B.F.'s categorical assistant and have Phyllis Fantozzi and Rebekah Bouldin act as his assistants. *Id.* The school indicates this was done in the "spirit of cooperation" while B.F.'s parents insist it was done because Mr. Griffin was incompetent. *Id.* & Resp., DSMF, ¶ 75. Ms. Fantozzi would only work with B.F. until 2:00 p.m. because she had other contractual obligations, and Ms. Bouldin would finish the day. *Id.* B.F.'s parents also testified that the Metro North weekly summaries of B.F.'s participation in class did not always come home, and many of the family's inquiries went unanswered. PSMF, ¶ 25.

AO 72A
(Rev.8/82)

At the September 4, 2003 meeting, B.F.'s parents told Ms. Novak that they found the draft behavioral intervention plan unacceptable and that they were getting private assistance with the plan and would forward revisions to the school. DSMF, ¶ 77. In the meantime, it was agreed to put an emergency protocol into effect. *Id.* The school district never received revisions from B.F.'s parents. *Id.* B.F.'s parents contend that a November 20, 2003 letter from Sheryl Pruitt of Parkaire Consultants to B.F.'s advocate, Jill Bender, served as a response. That letter, however, does not reference the behavioral intervention plan, and there is nothing to indicate it was specifically written for that purpose.

At the meeting, Ms. Pettes and Ms. Novak discussed with B.F.'s parents that the volume of communication from them to the staff was overwhelming. DSMF, ¶ 78. B.F.'s parents agreed not to e-mail excessively, and Ms. Pettes and Ms. Novak agreed that the family could e-mail staff so long as Ms. Pettes and Ms. Novak were copied on the e-mails. *Id.*

B.F. was having difficulty in his first semester in Spanish class. DSMF, ¶ 79. It was causing B.F. anxiety. *Id.* At the parents' request and the school's agreement, B.F. was allowed to drop the class and remove the grade from his transcript. *Id.* During that class period, B.F. received training in social skills and speech therapy. *Id.* During half of the class, B.F. received assistance in organizing his materials, completing homework, and discussing with his assistant behavioral issues and appropriate responses. *Id.* During the

other half, he received speech therapy that he had previously been getting at the beginning of the day. *Id.* B.F.'s parents assert that he did not receive this assistance consistently and it was not a legal class. Resp., DSMF, ¶ 79. A review of the testimony shows that a speech pathologist worked with B.F. during this class period and that Ms. Fantozzi would also review class materials and ensure that B.F. had his assignments correctly organized.

On September 18, 2003, B.F.'s parents met with each of B.F.'s teachers individually, and it was agreed that the meetings would occur monthly. DSMF, ¶ 80. The first monthly meeting occurred on October 10, 2003. DSMF, ¶ 81. Mr. F. requested that Ms. Pettes, Vivian Bankston, principal of Elkins Pointe Middle School, and Ms. Novak attend the meeting to discuss teacher lesson plans. *Id.* Mr. F. wanted copies of the plans each week so he could work with B.F. and prepare him for class. *Id.* Ms. Novak discussed her concerns that B.F. was feeling pressure to excel and was worried about making all As. *Id.* Ms. Novak stated she told B.F. that it was all right to make Bs. *Id.* Mr. F. became very angry about this statement and said that Bs were not acceptable as B.F. would need to make As to get into Georgia Tech. *Id.* While B.F.'s parents were concerned with the numbers of substitute teachers B.F. had, Ms. Fantozzi said that B.F.'s ability to handle that situation was a positive because he often had trouble with such transitions. *Id.* & Resp., DSMF, ¶ 81.

The theme of the staff's desire to have B.F. become more independent of his assistants continued at the beginning of the school year. DSMF, ¶¶ 82-84. Ms. Pettes

observed B.F. instructing Ms. Fantozzi to get his book for him and to take his assignments out of his notebook at the same time that B.F. was playing with his lap-top computer rather than paying attention to class. DSMF, ¶ 85.

The school communicated with B.F.'s parents through daily behavior sheets completed by B.F.'s assistants. DSMF, ¶ 86. The sheet identified ten positive instructional behaviors B.F. was to exhibit in class. *Id.* The assistants then recorded how B.F. performed on the tasks. *Id.* B.F.'s parents responded on those sheets, and Ms. Fantozzi would sometimes communicate with or call B.F.'s parents during the day. *Id.*

B.F.'s parents testified that during September 2003, B.F. was disruptive in class and had meltdown and periods of anxiety. PSMF, ¶ 28. B.F.'s math teacher testified that he was not more anxious this year than he had been the previous year. Another teacher testified that B.F. did have periods of poor behavior in class, but that it did not occur every day and that it did not affect his ability to keep up with the class. Resp., PSMF, ¶ 28. B.F. would cry at home and say he hated Metro North and Ms. Novak. PSMF, ¶ 29. In October 2003, B.F. became fearful that the police were coming after him because he was called to the office concerning an issue with fireworks. PSMF, ¶ 30.

On October 30, 2003, Ms. Novak and Ms. Fantozzi met with B.F. to discuss some instructional techniques they wanted B.F. to start using to make him less dependent on his assistants. DSMF, ¶ 87. This meeting displeased B.F.'s parents because they believed it to

be a unilateral amendment of the IEP which should have been discussed with them prior to its suggestion to B.F. Resp., DSMF, ¶ 87. The parents testified that B.F. was in an hysterical, emotional meltdown after the meeting. *Id.* The techniques suggested by the staff were B.F. writing his math and social studies assignments in his agenda on his own with practice in his social skills class. DSMF, ¶ 87. B.F. would also locate homework assignments in his notebook on his own. *Id.* He would also place assignments in the correct section of the notebook. He would also attend Connections classes on his own as he had done in the sixth grade. *Id.* As long as B.F. attempted to take notes in his laptop on his own, he would receive the backup copies of the notes. If he did not attempt to take notes, he would not receive the backups. *Id.* If he became disruptive on the class, he would be asked to go get a drink of water. *Id.* The staff gave B.F.'s parents a copy of the plan and they objected to it, so it was never implemented. *Id.*

The daily communications logs between the school and B.F.'s parents in the fall of 2003 contain innumerable details about B.F.'s experience in his classes. As Plaintiff points out, there are certainly particular days upon which B.F. had serious behavioral issues in class and his teachers expressed frustration with this. PSMF, ¶¶ 61-62, 65B.[2] Ms. Cohn testified, as did most of B.F.'s teachers, that he had good days and bad days. She described one specific incident where B.F. became stressed due to a question he could not answer on a test.

---

[2]The court notes, however, that focusing on a particularly bad day does not adequately describe the context of B.F.'s educational experience.

25

*See* Transcript (June 9, 2004), at 227-94. Ms. Cohn also stated that she would have added different behavioral objectives and taken away some others because she felt they were not as measurable as they needed to be. *Id.* at 266. For example, Ms. Cohn stated that she felt that B.F. should be writing down his own assignments. *Id.*[3] Ms. Cohn noted several behavioral issues that B.F. needed to work on, but overall, she stated that the placement had been successful. *Id.* at 292.

Ms. Alley, B.F.'s math teacher, testified that B.F. was a "good student. This is an on-grade level class, and he just hung in right around the high 80s, low 90s." *See* Transcript (June 8, 2004), at 233. "[A]s far as the material itself and the curriculum objectives, B.F. did those, absolutely." *Id.* At some point during the year, she had concerns about whether the placement was appropriate, not because of B.F.'s ability, but because she spent so much time with him during a class period that it impacted her ability to teach the other students in the class. *Id.* at 238-39. Ms. Alley testified that B.F. was very excited to be back in her classroom on March 15 and that the other students in class were pleased to have him back. *Id.* at 241.

---

[3]Plaintiff keys in on this testimony as an example of why B.F.'s IEP was not adequate. The court notes, however, that Ms. Cohn's suggestion that B.F. be required to write down his assignments was precisely the same suggestion that had been made by numerous educators at the school and rejected by B.F.'s parents. It is difficult to see how B.F.'s parents can point to this as an example of the deficiency of the IEP.

26

On November 4, 2003, B.F.'s parents and their attorney, Jill Bender, met with school staff in a contentious and hostile meeting. DSMF, ¶ 90; PSMF, ¶ 33. The staff explained they wanted B.F. to become more independent. *Id.* Mr. F. stated that B.F. had more meltdowns in the past week than he had in the past year. *Id.* B.F.'s parents demanded that Ms. Novak be removed as B.F.'s case manager as she was no longer acceptable to them and utilized procedures they described as "stupid management policies." *Id.* They stated that her leadership was by "decree and inform" and not working with them and they would not be told what to do. *Id.* Mr. F. stated, "the only person that I am aware of that I have difficulties with is Liz." *Id.* The school asserts that at no point in this meeting did B.F.'s parents or attorney state that B.F., himself, feared Ms. Novak or that her presence reminded him of unpleasant experiences at Metro North. *Id.* No one stated that B.F. had memories of Ms. Novak standing by while B.F. was physically restrained at Sweet Apple. *Id.* B.F.'s parents testified that they believed Ms. Novak to be incompetent and her unilateral actions were the cause of B.F.'s emotional distress. B.F.'s parents also state they told Ms. Novak and Ms. Pettes at this meeting that B.F. was terrified of Ms. Novak and "pleaded for them to take her off his case." *Id.*

On November 20, 2003, B.F. left physical education during the class time. DSMF, ¶ 92. Ms. Fantozzi followed B.F. out of the class and found him sobbing in the hallway. *Id.* He said he had been on a basketball team but had been kicked off because he could not

27

shoot. *Id.* He said he was tired of being teased, that he had no life, that he did not want to go to school anymore, that he really had no friends, and they were just pretending to be his friends because of his disability. *Id.* He said that he wanted to go home, but when Ms. Fantozzi asked if he wanted to call his father, he said he did not want to. *Id.* Ms. Fantozzi took him to an area with fewer students around and asked either Ms. Novak or Mr. Reitz to come and help her. *Id.* He began to tell both Mr. Reitz and Ms. Fantozzi that he was better off dead, had no friends, was not good at anything, and that everyone teased him. *Id.* He said that he had been told he could not sit with his friends at lunch the day before. *Id.* He expressed frustration that his parents expected him to get As in every subject. *Id.* At this point, B.F. began to explain in calm detail about how he would take his life and what instrument he would use, and Ms. Fantozzi and Mr. Reitz decided to call B.F.'s father. *Id.* Mr. F. came to school and met with B.F. in a room. *Id.* When Ms. Novak returned to school and learned of the incident, she came to the room. *Id.* Mr. F. ordered her to leave the room. When she sat down, he said, "we're leaving" and signed B.F. out of school. *Id.*

Dr. F. met with B.F. that afternoon and assessed his state. DSMF, ¶ 93. That evening, B.F. met with Dr. Cynman. *Id.* He was not hospitalized for suicidal ideation. *Id.* The next day, Ms. Bender notified Ms. Pettes that B.F.'s treating psychiatrist had recommended that B.F. not return to school until December 1, 2003. DSMF, ¶ 94. The school agreed to provide B.F.'s make-up work to his parents. *Id.* Ms. Bender requested that

Ms. Novak and Ms. Bouldin be removed from providing services to B.F., but the school denied this request because it believed the request was based on the personal feelings of B.F.'s parents and not the performance of the employees. *Id.* B.F.'s parents claim this request was denied for "tactical" reasons. Resp., DSMF, ¶ 94.

B.F. did not return to school for the remainder of the semester. DSMF, ¶ 95. His parents would pick up his assignments and return them to school. *Id.* B.F. came to school to take his tests, but Ms. Fantozzi testified he did not want to stay long when he came in to school. *Id.* An IEP meeting was scheduled for December 15, 2003 to prepare for B.F.'s return to school. DSMF, ¶ 96.

In December 2003, the staff provided to B.F.'s private psychologist a list of inappropriate behaviors and comments made by B.F. in the classroom for which they wanted some suggested interventions and strategies when these behaviors occurred. PSMF, ¶ 34A.

Although the school was not aware of it, B.F.'s parents had Dr. Kathleen Platzman, a licensed psychologist, conduct an evaluation of B.F. on October 29, 2003. DSMF, ¶ 97. One of the purposes of the evaluation was to determine whether B.F. was receiving appropriate school services. *Id.* The school district did not receive a copy of Dr. Platzman's evaluation until one workday before the scheduled IEP meeting in December. *Id.* Dr. Platzman did not observe B.F. at school. DSMF, ¶ 98. She received input only from Ms. Fantozzi and not any of B.F.'s academic teachers. *Id.* B.F.'s teachers did not receive a

29

request for information until January 4, 2004, after Dr. Platzman had submitted her report, although B.F.'s parents assert that she supplemented her report after getting responses from the teachers. *Id.* & Resp., DSMF, ¶ 98. Dr. Platzman diagnosed B.F. with Kallman's Syndrome, specific learning disorder in written expression, obsessive compulsive disorder, and Asperger's Syndrome, although she testified at the hearing before the Administrative Law Judge that she added the Asperger's findings at the request of B.F.'s counsel, Mr. Zimring. DSMF, ¶ 99.

Dr. Platzman recommended continuation of speech language therapy, especially the pragmatic aspects of language; a sensory diet; exploration of a home program that would be helpful in teaching B.F. to recognize when his arousal is up-regulating; recognition of the circumstances that impact B.F.'s anxiety and frustration; transition of B.F. out of handwriting as much as possible; giving B.F. warnings prior to change in school schedule or routine; praising him for tolerating a change in schedule; rehearsing unexpected changes in the rules; having a secret signal for B.F. when it is time to follow authority figures without question; and praising him when these rehearsals are negotiated well. DSMF, ¶ 100.

B.F.'s 2003-04 IEP provided for speech and language therapy with an emphasis on the pragmatic aspects of language. DSMF, ¶ 101. Ms. Patel, B.F.'s speech language pathologist worked with B.F. one-on-one and in small settings. *Id.* She used social scripting, role playing and life stories to help B.F. improve his social skills and observed him

at lunch to see how he applied what he was learning. *Id.* Plaintiff contends that Ms. Patel's services were "appropriate" for B.F., but not based on his autism-Asperger's Syndrome diagnosis because the need for "language and pragmatic language is intrinsic to AS." *See* Resp., DSMF, ¶ 101.[4]

The school district also provided B.F. with an AlphaSmart and then a laptop to alleviate the need for handwriting. DSMF, ¶ 102. As part of his IEP, B.F. received information on changes in scheduling and was praised when he tolerated a number of substitute teachers well. *Id.* Plaintiff denies this statement of fact stating that Defendant did not timely provide these services and that B.F. was not able to tolerate change. The court does not find evidence in the report to support this denial.[5]

The IEP team met on December 15, 2003, but the school district would not discuss Dr. Platzman's recommendations as its staff had just received them. DSMF, ¶ 103. Principal Vivian Bankston requested information from B.F.'s treating psychiatrist regarding his current emotional state and whether he was ready to return to school. *Id.* B.F.'s parents requested that B.F. have only one assistant instead of two. *Id.* The school said that Ms.

---

[4]The court does not understand the significance of Plaintiff's statement. The court finds that the actual services recommended by Dr. Platzman were nearly identical to those provided by Ms. Patel, which Plaintiffs, themselves, characterized as "appropriate." The fact that Ms. Patel may not have labeled them as necessary to address autism-Asperger's Syndrome does not change the practical effect of the therapy she provided.

[5]Plaintiff's only citation to the record is Ms. Cohn's testimony at page 282. That discussion involves whether B.F. could play a finger tug of war game.

Bouldin could be his sole assistant, but the parents said it had to be Ms. Fantozzi. *Id.* The district informed the parents that she could not be his assistant for the full day because she had other contractual obligations beginning at 2:00 p.m. *Id.* The school district also refused to remove Ms. Novak as B.F.'s case manager. *Id.* The committee agreed to meet again by phone on January 5, 2004 to discuss plans for B.F.'s return to school. *Id.*

On January 5, 2004, the staff received a letter from Dr. Cynman dated December 23, 2003, in which she stated that B.F. was denying any suicidal thinking and was confident those thoughts were behind him. DSMF, ¶ 105. Dr. Cynman, however, still felt that B.F. was fragile, but that he was safe to return to school as long as he was supervised. *Id.* Dr. Cynman stated that B.F. should be within eyesight of his aide at all times, that he was not considered a threat to run, and that no objects had to be kept from him. *Id.* Dr. Cynman stated that he had referred B.F. to Dr. Jonathan Lauter for future psychiatric care. *Id.* As part of his recommendations, Dr. Lauter, in a January 5, 2004 letter, stated that B.F. did not require supervision at all times. DSMF, ¶ 106.

Dr. Lauter's letter also stated that B.F.'s fall semester had been a "struggle due to a breakdown in his school environment." *See* DSMF, ¶ 113 & Plaintiff's Exh. 65. He "needed a low-key safe educational structure providing a warm and engaged aide in order to assist [him] in his daily, social endeavors." *Id.* During the semester, B.F. "felt unduly

32

criticized and threatened by school staff and eventually he imploded which he released via a verbal expression of suicidal ideation." *Id.*

Dr. Platzman made numerous detailed recommendations concerning B.F.'s return to school. She also recommended that B.F. have only one assistant a day and based on the parents' reports to her, suggested that the assistant be Ms. Fantozzi. DSMF, ¶ 107. When Ms. Fantozzi left at 2:00 p.m., Dr. Platzman recommended that B.F. receive homebound schooling for the last two periods of the day. *Id.* Dr. Platzman suggested that the school communicate throughout the day with B.F.'s parents and have B.F. return to his group of friends at lunch with an aide in eyesight. *Id.* She also wanted B.F. to use a series of cards to signal school staff when he was feeling anxious as a method of avoiding meltdowns. *Id.*

On January 5, 2004, Ms. Bankston, Ms. Pettes, Ms. Novak, Ms. Fantozzi, Ms. Bouldin, B.F.'s parents, and counsel for both parties participated in a telephone conference. DSMF, ¶ 108. The school agreed to provide an assistant that would have B.F. in eyesight during classes and to and from lunch, except for bathroom breaks. B.F.'s parents requested having only one assistant, the school offered Ms. Bouldin, but the parents refused her as an assistant and stated that the school could hire another assistant if Ms. Fantozzi could not work the whole day because B.F. was not comfortable with Ms. Bouldin. *Id.* The parents then requested homebound services for the last two periods of the day if Ms. Fantozzi had to leave. *Id.* From the school district's perspective, the only reason the parents requested

33

homebound services was because they preferred Ms. Fantozzi to Ms. Bouldin and not because B.F. was not capable of attending school. *Id.* The parents again requested that Ms. Novak be removed as B.F.'s case manager. Mr. F. stated that if she was not removed, B.F. would not return to school and the parents would request full-day homebound instruction. *Id.* The school district's minutes of the telephone conference reflect that the school agreed to implement the card system recommended by Dr. Platzman and would send a draft of the plan to B.F.'s parents for review. DSMF, ¶ 109. Ms. Bankston agreed to send a homebound services request form to Plaintiff's counsel. *Id.*

On January 6, 2004, the homebound services request form was sent to Plaintiff's counsel, Mr. Zimring. DSMF. ¶ 110. A draft plan for the card system was sent to Mr. Zimring on January 9. *Id.* A safety plan was drafted based on Dr. Platzman's recommendations, but the family found it inadequate. *Id.* & Resp., DSMF, ¶ 110.

On January 7, 2004, Plaintiff's counsel returned the homebound services request form to the school district but without the signature of B.F.'s parents. DSMF, ¶ 114. The reason listed for the homebound services request was Asperger's Syndrome. *Id.* The school informed Plaintiff's counsel it needed the parents' signatures and requested additional information supporting the request for homebound services. *Id.*

On January 14, 2004, Dr. Platzman met with B.F.'s classroom teachers, Ms. Bankston, B.F.'s two assistants, his speech pathologist, and occupational therapist, Ms.

34

Novak, Ms. Pettes, B.F.'s parents and their counsel. DSMF, ¶ 111. The teachers suggested to Dr. Platzman that B.F. would not use the card system she recommended because it would cause embarrassment for him in front of his peers which was a major concern of his. *Id.*

Dr. Lauter saw B.F. again on January 9, January 30, and again on March 8, 2004. DSMF, ¶ 116. The parties exchanged correspondence in January and February 2004. *See* Respondent's Exh. 84, starting at 1038. On January 22, 2004, Plaintiff's counsel inquired as to whether the school district would agree to the changes in services requested by the parents, including "the use of a single aide, a limitations of Ms. Novak's activities, the adoption of a direct and daily communication system between the parent and the school and school personnel, without monitoring or restriction by administrative personnel, and the required coordination and consistency in the delivery of sensory input and consistency in the delivery and response to behavioral consequences across all teachers, therapists and educational environments." *Id.* at 1045-46. The school district responded on February 10, 2004, stating that it needed more information on why a request for homebound services would be justified. *Id.* at 1047. The school district stated that without evidence of a medical condition, issues would be raised under Georgia's Compulsory Attendance Act. *Id.* The school district again responded that Ms. Fantozzi could be B.F.'s aide until 2:00 p.m. B.F.'s remaining classes were social studies which was team taught and one teacher had special education experience and math where B.F. generally did well. Ms. Bouldin could shadow

35

him in those two classes. *Id.* at 1048. The district again refused to remove Ms. Novak. *Id.* The school agreed that the parents could communicate with all school personnel but that Ms. Novak would need to be copied on the communication. *Id.* The school agreed to implement sensory input as recommended by Dr. Platzman but thought it would be better if this could be done without B.F. having to leave the classroom as he was reluctant to do so. *Id.* The school asked for recommendations from Dr. Platzman on this issue. *Id.* The school also expressed a willingness to have a behavioral response system in place but suggested that B.F. needed to give his input on this as he would most likely not want to use a card system in front of his peers. *Id.*

On February 23, 2004, Plaintiff's counsel wrote to the school district concerning B.F.'s continued absence from school and stating that the school refused to make the accommodations requested by the parents and B.F. could not return to school under those circumstances. DSMF, ¶ 117. On February 27, 2004, the school district responded that it believed B.F.'s IEP and the recommendations it agreed to incorporate addressed B.F.'s educational needs. *See* Respondent's Exh. 84, at 1055. The district again requested documentation for homebound services and indicated that it would not continue to send assignment home on an indefinite basis. *Id.* at 1055-56. The school stated that it would cease sending assignments and allowing B.F. to come to school to take tests as of March 15, 2004. *Id.* at 1056.

AO 72A
(Rev.8/82)

On March 9, 2004, Plaintiff's counsel sent a letter to the school district stating that it was "amazing" that the district would require any additional justification for homebound services. *Id.* at 1057. B.F.

> who has Aspberger's [sic] Syndrome and depression, is not at school because he was suicidal and is PTSD [post traumatic stress disorder], based, in material part, due to his reaction to the program that the District provided and now wants to re-institute. It is also true that he attaches his depression and ideations to the actions, conduct and program at school, and that he had fears of school personnel, including Ms. Novak. This has been repeated time after time and your client has decided to ignore that.

*Id.* at 1057-58. Plaintiff's counsel further noted:

> My client will consider re-initiation of services, but in making that determination, they asked me to make it clear to your client, up to and through the highest decision-making authorities, that if they do so, they do so under coercion and without choice, that they do not consent or agree or imply as to the propriety of the program your client offers, nor do they agree or consent to any contact or interaction from Ms. Novak, and that they will hold your client strictly responsible for any events which occur at school and the risks that they have identified for your client. It is the school system which is insisting on putting [B.F.] at risk and trying to coerce compliance, in a manner in which we believe is deliberately indifferent to [B.F.'s] health and welfare, occurring with notice of those risks and upon threat of termination of adequate support.

*Id.* at 1058. Plaintiff's counsel attached a letter from Dr. Lauter to evidence the need for homebound services. Dr. Lauter expressed that B.F.'s seventh grade experience had been "different than he expected" and that personnel in his program were changed. *Id.* at 1060. B.F. "experienced significant changes in the way he was managed and treated by staff on a day-to-day basis at school. It is my opinion that these changes and a series of associated

37

events at school led to a serious mental and emotional decline in" B.F.'s condition. *Id.* He became "frustrated and depressed" and this lead to the suicidal ideation in November. *Id.* at 1061. Dr. Lauter stated that he believed B.F. was experiencing Post Traumatic Stress Disorder due to his experiences at Elkins Pointe. *Id.* B.F. told Dr. Lauter that he could not handle a program administered by Ms. Novak and "holds her responsible for making him feel unsafe at school." *Id.* Dr. Lauter also stated that B.F. had "very real fears" about Ms. Bouldin. *Id.* "It is my professional opinion that returning him to a school program in which either he or his parents have to deal with these staff personnel would be returning him to the same trauma and would be extremely unsafe." *Id.* The diagnosis of Post Traumatic Stress Disorder was new and the school district first learned of it in this March 9, 2004 letter. DSMF, ¶ 117.

On March 12, 2004, Mr. F. notified Ms. Novak that B.F. would return to school on Monday, March 15, 2004, but the family was doing so under duress. DSMF, ¶ 126. Mr. F. directed Ms. Novak not to have any direct contact with B.F. and that daily written reports be sent to Dr. Lauter. He asked that the recommendations in Dr. Platzman's report be implemented. *Id.* Ms. Novak responded the same day that the staff was excited to have B.F. return to Elkins Pointe. DSMF, ¶ 127 & Plaintiff's Exhibit 178. The school would continue to complete daily communication forms. She would be B.F.'s case manager and if she had any direct contact with B.F., she would document it. *Id.* B.F. could use a phone in a private

area of North Metro if he needed to call his parents.  *Id.*  She suggested that there be a meeting on March 16, 2004, to discuss a break plan and that the safety cards suggested by Dr. Platzman would be ready at that time.  *Id.*  She informed Mr. F. that Ms. Bouldin and Ms. Fantozzi would greet B.F. when he arrived on Monday.  *Id.*

On March 15, Ms. Bouldin took B.F. in to school while Ms. Fantozzi discussed the safety card plan with Mr. F.  DSMF, ¶ 128.  Mr. F. indicated that B.F. preferred to tap his finger on his desk if he needed assistance.  *Id.*  B.F.'s parents testified that on this day B.F. was very nervous and fearful of Ms. Novak.  *Id.* & Resp., DSMF, ¶ 128.  Testimony at the administrative hearing showed that B.F. appeared to have a good day at school and was smiling.  DSMF, ¶ 129.  He appropriately handled a change in seating that had been made in one of his classes.  *Id.*

The next day, however, Ms. Fantozzi did not accompany B.F. into the school cafeteria because she was attempting to straighten out a problem with B.F.'s team teacher schedule.  DSMF, ¶ 130.  B.F. got upset when he tried to sit in a seat at the cafeteria and misunderstood that he was not being permitted by the children to sit there.  *Id.*  B.F. left the lunch room.  *Id.*  Ms. Debra Cohn, B.F.'s special education teacher from science, saw B.F. in the hallway and asked where he was going.  DSMF, ¶ 131.  He did not answer her and Ms. Cohn went to seek assistance in the teacher's lounge where she saw Ms. Novak and told her B.F. had left the cafeteria.  *Id.*  Ms. Fantozzi and Ms. Novak split up to look for B.F.

AO 72A
(Rev.8/82)

DSMF, ¶ 132.  Ms. Novak found B.F. in the media room and asked him if he wanted to go look for Ms. Fantozzi.  *Id.*  They were in the hallway when Ms. Fantozzi arrived.  *Id.*  B.F.'s father testified that Ms. Novak was taking B.F. back to Metro North when Ms. Fantozzi arrived.  *Id.* & Resp., DSMF, ¶ 132.  B.F. was not visibly upset in the media center but had told the library assistant that he was not allowed to sit with his friends.  DSMF, ¶ 133.  Throughout the episode, B.F. talked calmly with both Ms. Fantozzi and Ms. Novak.  *Id.*

Ms. Fantozzi asked whether B.F. wanted to talk to his dad and when he called his dad, he also told his father that he was not allowed to sit with his friends.  DSMF, ¶ 134.  B.F. also told his father that Ms. Novak had spoken with him.  *Id.*  Mr. F. spoke with Ms. Fantozzi and told her that he was coming to pick up B.F.  *Id.*  Ms. Fantozzi stayed with B.F. outside the school while waiting for his father.  *Id.*  B.F. was calm during this time.  *Id.*  When Mr. F. arrived, he told Ms. Fantozzi that this was a recurrence of what had happened before.  *Id.*  At the direction of B.F.'s treating physician, B.F. did not return to school after this incident.

Ms. Patel, B.F.'s speech language pathologist, was not told about any safety plan and was not told by Ms. Fantozzi to accompany B.F. to the cafeteria.  PSMF, ¶ 67.  She did not participate in the telephone conference calls and did not talk with Ms. Novak or Ms. Pettes about how to observe B.F. when he returned to school.  *Id.*

On March 17, 2004, Plaintiff's counsel sent a letter to the school district counsel stating that the plan for supervision had failed and caused Mr. F. to remove B.F. from school. *See* Respondent's Exh. 84, at 1062. He stated that Ms. Novak's intervention exacerbated the situation and was harmful to B.F. emotionally. *Id.* Plaintiffs requested that B.F.'s assignments be forwarded to the home and that he be provided homebound services for four hours per day with attendance in school for chorus. *Id.* at 1063. They also requested direct instruction at home from B.F.'s school teachers. *Id.* Plaintiff's counsel added:

> In addition, my clients share the conclusion that the actions by Ms. Novak, and perhaps others who may have directed her to maintain her direct contact with [B.F.], were both intentional and abusive. We believe there is reasonable cause to see such acts as child abuse and therefore we ask that your client initiate the mandatory reporting requirements to the Department of Family and Children Services for an investigation. We would appreciate it if you would let us know if that has occurred.

*Id.*

On March 19, 2004, Plaintiff's counsel submitted a new form for homebound services signed by B.F.'s parents and Dr. Lauter. DSMF, ¶ 118. The request was based on Asperger's Syndrome and asked that B.F. be allowed to attend chorus at school. *Id.*

B.F.'s parents, with supporting documentation from Dr. Lauter, submitted a request to the Fulton County School District to continue a medical hardship allowing B.F. to attend Elkins Pointe Middle School, which was not his districted middle school. DSMF, ¶ 122,

Plaintiff's Exhibit 177, at 463. Dr. Lauter stated that B.F. had become accustomed to the environment at Elkins Pointe and had found a peer group of friends which provided him "great solace." *Id.* Dr. Lauter indicated that any transfer away from Elkins Pointe would "harm him psychologically and undermine his academic progress." *Id.*

B.F.'s math and special education teachers in his science and social studies class stated that B.F. performed the same work as the other students in the class and performed at an A level, even though he did have behavioral issues in class. DSMF, ¶ 135. B.F.'s math teacher expected B.F. to be in the algebra class in Elkins Pointe in the eighth grade. *Id.*

On April 12, 2004, B.F. started school at the Lionheart School in Alpharetta, Georgia on a part-time basis because the school did not have the staffing available for B.F. to attend full time. DSMF, ¶ 138. B.F. also received "mentoring" services from Birmingham Learning Centers on organizational skills and tutoring and additional instructional time from Academic Solutions. *Id.* B.F. was in the middle-upper program at Lionheart. DSMF, ¶ 139. The director of that program has no educational background in teaching but does hold a master's degree in counseling and an M.B.A. DSMF, ¶ 140. The only certified teacher at Lionheart's middle-upper school program would be a special education certified teacher who was to begin in the 2004-05 school year. DSMF, ¶ 141. There are no certified teachers in academic subject areas, and academic instruction is not based on a structured curriculum,

but rather on a student's interests. *Id.* There are no nondisabled students at Lionheart, and the school has not attempted to transition any of its middle-upper program students into a less restrictive environment. DSMF, ¶ 143. Lionheart does not provide daily communication logs to parents although it intends to provide weekly communication to parents in the 2004-05 school year. DSMF, ¶ 144.

Dr. Lauter and Dr. Platzman testified they believed the Lionheart School was an appropriate educational environment for B.F. PSMF, ¶ 49. The school has small groups and focuses on social and emotional relationships including students with autism spectrum disorders. PSMF, ¶ 52. It has academic instruction with regular periods of art and music, journal writing, social skills, communication skills and social and emotional development in time. *Id.*

In his supplemental testimony, however, Dr. Lauter testified that B.F.'s parents were concerned about exposure of B.F. to the misbehavior of other students, the quality of academics at Lionheart, and the fact that the middle-upper director was leaving after the 2004-05 school year. *See* Lauter, Dec. 21, 2007, at 58-59. B.F. became distressed with the school situation at Lionheart and did not want to attend there anymore. *Id.* at 59-60. Eventually B.F. switched schools. DSMF, ¶ 145.

AO 72A
(Rev.8/82)

**D.      Order of the Administrative Law Judge**

In an order dated September 2, 2004, the Administrative Law Judge denied Plaintiff's requests for relief.  After a twenty-seven-page recitation of the facts and history of B.F.'s case, the Administrative Law Judge found that a Free and Appropriate Public Education is one which (1) is provided pursuant to an IEP that has been developed in compliance with the procedural requirements of the IDEA; (2) is designed to meet the student's specific needs; and (3) is calculated to enable the student to receive educational benefit.  *See* Order, at 28 (citing *Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982)). Procedural violations must be shown to have caused some kind of demonstrable harm such as the loss of educational opportunity or denial of the parents' opportunity to participate effectively in the IEP process.  *Id.* at 28-29 (citing *School Board of Collier County v. K.C.*, 285 F.3d 977  (11th Cir. 2002)).

The Administrative Law Judge found that Fulton County satisfied prong one because B.F. was not denied educational opportunity and his parents were effectively able to participate in the IEP process.  *Id.* at 29.  The Administrative Law Judge determined that communication between the parents and the school was frequent, occurring at least on a daily basis, particularly noting more than 900 e-mails exchanged between the school and the parents.  He found without merit, therefore, the parents' assertion that there was a lack of communication from the school.  *Id.*

44

The Judge further found that B.F.'s parents were permitted to participate extensively in the IEP meetings, noting that many of the accommodations requested by the parents were incorporated into the IEP. *Id.* at 29-30. Finally, he concluded that the October 30, 2003 meeting where Ms. Fantozzi and Ms. Novak presented to B.F. various strategies aimed at increasing his independence was not an "IEP meeting" at which the parents were not invited to attend, but rather was a discussion of instructional strategies to be used in the classroom. *Id.* at 31. Issues of teaching methodology were appropriately left to educators to make. *Id.* (citing *Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176 (1982)). Alternatively, even if it were a procedural violation, B.F. and his parents suffered no harm because the school district did not implement the strategies after B.F.'s parents complained. *Id.*

With respect to B.F.'s education records, the Administrative Law Judge found no merit to Plaintiffs' claims that they had not received B.F.'s educational records in time to prepare for trial. The Judge noted that discovery is not available in Georgia for administrative proceedings and Plaintiffs were provided at trial with six four-inch-wide notebooks of records from Fulton County. Plaintiffs also argued that Fulton County had not provided the access to B.F.'s educational records required by the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g, and the IDEA, 34 C.F.R. § 300.562. Relying on the Supreme Court's decision in *Owasso Independent School District v. Falvo*, 534 U.S.

45

426 (2002), the Administrative Law Judge found that "education records" as understood under FERPA are those that are maintained by a single custodian, such as a registrar.  *See* Order, at 32.  The Supreme Court found that Congress could not have meant every single record kept by any individual related to a student.  *Id.* at 33 (citing 534 U.S. at 434-35).  The Judge recognized that B.F.'s parents e-mailed two school employees in July 2003 seeking records but that neither of these individuals was a custodian of records and both were off on summer vacation.  B.F.'s father made another request in August to the director of the North Metro Psychoeducational Program, and those records were then provided to him within the forty-five days required under FERPA.  Finally, the Judge noted that although the parents complained that those records did not contain certain e-mails, under *Owasso*, the school district was not required to turn those types of documents over.  *Id.* at 33.  Alternatively, even if the school district failed to turn over certain documents required under the IDEA, Plaintiffs had not shown that this failure denied B.F. "appropriate education."  *Id.* at 34.

Turning to the substantive aspects of Plaintiff's complaint, the Administrative Law Judge considered Fulton County's failure to complete a new disability eligibility based on Dr. Platzman's diagnosis of Asperger's syndrome.  *Id.* at 35.  The Judge noted that the purpose of an IDEA evaluation is to assist with two issues:  (1) whether the child is a child with an IDEA-listed disability and (2) the content of the child's IEP.  20 U.S.C. § 1414(b)(2)(A); 34 C.F.R. § 300.532(b).  *Id.*  "The evaluation must be sufficiently

comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.532(h). *Id.* The Judge noted that there was no dispute between Fulton County and the parents that B.F. was a child with a disability and required services and placements. *Id.* The recommendations made by Dr. Platzman based on her diagnosis of Asperger's syndrome were already part of B.F.'s IEP. *Id.* at 36. The Judge rejected Plaintiff's complaint that the school district refused to consider Dr. Platzman's recommendations, noting that her evaluation was received by the school district one work day prior to the scheduled December 15, 2003 IEP meeting. *Id.* On January 14, 2004, Fulton County staff who interacted with B.F. met with Dr. Platzman to review the report. Thus, the Administrative Law Judge concluded that Fulton County did consider Dr. Platzman's report. *Id.* at 37.

The Administrative Law Judge next considered Plaintiff's argument that B.F. did not receive a Free and Appropriate Public Education because his IEP did not include a behavior intervention plan. He held that a behavior intervention plan is not a "mandatory" element of an IEP. *Id.* at 37-38. Even if the behavioral intervention plan were a mandatory part of the IEP, the Judge found that Fulton County offered B.F.'s parents a plan on September 2, 2003. On September 4, the parents informed Fulton County that the proposed plan was not acceptable to them and they were obtaining private assistance to create a plan and would

47

give further feedback to Fulton County after they had that information. Fulton County states they never received any suggested revisions from the parents. The parents assert that a November 30, 2003 letter from Sheryl Pruitt was their response. The Judge, however, noted that this letter did not reference a behavioral intervention plan, but rather appeared to be only generalized suggestions. Thus, the Judge concluded that Fulton County could not have recognized this as the parents' response to the draft behavioral intervention plan, and any delay in the implementation of the plan could be attributed to the actions of the parents. *Id.* at 38-39.

Plaintiff also argued that Fulton County denied B.F. the appropriate education in the second semester of the 2003-04 school year because he required homebound instruction and the school district did not always provide it. *Id.* at 39. The Administrative Law Judge, however, noted that the first request made by the parents on January 7, 2004, was not accompanied by the required parental signature. *Id.* at 40. Further, the only reason provided for the homebound services request was B.F.'s diagnosis of Asperger's Syndrome. The school district required additional information from the parents because they had numerous students with Asperger's Syndrome educated at the school location and therefore needed additional justification for why this was not sufficient or appropriate for B.F. *Id.* The parents did not provide additional information until March 9 when Dr. Lauter wrote a letter

asserting that B.F. had Post Traumatic Stress Disorder and would require homebound

services until Ms. Novak and Ms. Bouldin were replaced. *Id.* The Judge concluded:

> The record therefore does not support B.F.'s claim that he could not have
> returned to school in January. Dr. Cynman, B.F.'s treating psychiatrist at the
> time of his suicide ideation, wrote on December 23 that B.F. could return to
> school as long as he was supervised. Dr. Platzman's recommendation that he
> attend school for all but the last two periods of the day was based upon her
> disagreement with the use of two assistants with B.F. and not upon a medical
> or psychological reason. On January 5, [Fulton County] agreed to provide the
> supervision recommended by Dr. Cynman, to send the parents his class
> schedule, to implement a card system recommended by Dr. Platzman for B.F.
> to communicate his feelings and his need for assistance, and to provide only
> one assistant to work with him throughout the day. However, the parents did
> not agree with the individual [Fulton County] selected and also demanded
> removal of Ms. Novak as his case manager. When [Fulton County] refused,
> only then did the family request homebound services. However, selection of
> a student's teacher or case manager is solely with the authority of [Fulton
> County.] See, Letter to Fisher, 21 IDELR 992 (OSEP 1994). And the
> Georgia Board of Education Rule governing homebound services does not
> provide for services when the parents disagree with the selection of the
> individuals working with their child.

*Id.* at 41. Furthermore, the Administrative Law Judge noted there was no "credible

evidence" in the record that either Ms. Novak or Ms. Bouldin presented a danger to B.F.

*Id.* at 41-42. Dr. Lauter's letters recommending that B.F. not have to interact with these two

individuals cited conversations with B.F.'s parents. *Id.* at 42. Dr. Lauter did not consult

with B.F.'s teachers or the staff at Fulton County, and he did not observe B.F. in the school

setting; thus, the Administrative Law Judge gave only "limited weight" to his assessment

of B.F.'s educational program. *Id.*

Under applicable case law, the Judge found that the achievement of passing marks and advancement from grade to grade were important factors to consider in evaluating whether the student received the appropriate level of educational benefit. *Id.* at 43-47. Based on B.F.'s academic progress, the Judge determined that he received an adequate program that was reasonably calculated to provide B.F. with educational benefit. *Id.* at 47.

In the alternative, the Administrative Law Judge concluded that B.F.'s placement at the Lionheart School was not appropriate private placement because it was a more restrictive environment than that B.F. had in Fulton County. *Id.* The Lionheart School had no non-disabled students and no opportunity for "mainstreamed" experiences. *Id.* at 48. The Judge further found that B.F. could not demonstrate that the Lionheart School would meet his educational needs because none of the teachers at Lionheart held current teaching certificates in academic subjects and the director of the middle school program had no formal training in the education of special needs children. The school had only been in existence for two years and had no advanced academic programs, such as algebra, from which B.F. could benefit. *Id.* Finally, the school's educational methodology remained untested. *Id.* In conclusion, the Administrative Law Judge denied the relief sought by Plaintiff.

E.     **Contentions** [6]

---

[6]The court GRANTS Defendant's motion for leave to file excess pages [74]; GRANTS Plaintiff's motion for leave to file excess pages [76]; GRANTS Plaintiff's motion

50

Plaintiff argues that the court should not defer to the findings of the Administrative Law Judge because he adopted the findings of fact offered by Fulton County; he failed to recognize certain "admissions" made by Fulton County staff members; he ignored testimony from other staff members as to whether B.F.'s progress should be judged solely on his behavioral issues or whether his academic success could be considered as well; and he did not address certain critical issues. Plaintiff further argues that B.F. did not receive a Free and Appropriate Public Education because his IEP did not contain a Behavioral Intervention Plan; Fulton County did not amend B.F.'s IEP to include a diagnosis of Asperger's Syndrome; B.F. continued to have behavioral and social issues in school; Fulton County refused to continue homebound services; and B.F. did not receive from the occupational therapist the services outlined in the IEP.

Defendant responds that this court should defer to the findings of the Administrative Law Judge which included findings of fact from both parties in his factually detailed order, considered the testimony of all witnesses over an intensive six-day administrative hearing, and appropriately considered the academic progress B.F. was making in determining whether he was receiving a Free and Appropriate Public Education. Defendant further argues that the school was providing the specific services that B.F.'s private doctors were recommending based on their diagnosis of Asperger's Syndrome. Defendant avers that it

for leave to file excess pages [82]; GRANTS Defendant's motion for leave to file excess pages [83]; and GRANTS Defendant's motion for leave to file excess pages [85].

AO 72A
(Rev.8/82)

was B.F.'s parents who had problems with the school staff despite the hours of time spent by both parties in meetings and communications working to assist B.F. Finally, Defendant responds that Plaintiff is not entitled to relief because the Lionheart School is not an appropriate placement for B.F.

## II.     Discussion

### A.     General Framework of the IDEA

In analyzing whether a school has provided a Free Appropriate Public Education, the court considers a two part test to determine (1) whether the state actor has complied with the procedures set forth in the IDEA, and (2) whether the IEP developed pursuant to the IDEA is reasonably calculated to enable the child to receive educational benefit. *Board of Education v. Rowley*, 458 U.S. 176, 206-07 (1982). "A procedurally defective IEP does not automatically entitle a party to relief. In evaluating whether a procedural defect has deprived a student of [Free Appropriate Public Education], the court must consider the impact of the procedural defect, and not merely the defect per se." *School Board of Collier County v. K.C.*, 285 F.3d 977, 982 (11th Cir. 2002) (quotations and citations omitted). "The [Free Appropriate Public Education] described in an IEP need not be the best possible one . . . rather, it need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction." *Loren F. v. Atlanta Independent School System*, 349 F.3d 1309, 1312 (11th Cir. 2003)

AO 72A
(Rev.8/82)

(quoting *Pace v. Bogalusa City School Board*, 325 F.3d 609, 618-19 (5th Cir. 2003)). *See also JSK v. Hendry County School Board*, 941 F.2d 1563, 1573 (11th Cir. 1991) ("while a trifle might not represent 'adequate' benefits . . . maximum improvement is never required"); *E.D. v. Enterprise City Board of Education*, 273 F. Supp. 2d 1252, 1263 (M.D. Ala. 2003) ("[A] denial of a [Free Appropriate Public Education] is difficult to establish. The standard for whether an IEP provides a FAPE is whether it is reasonable calculated to confer the basic floor of educational benefits.") (cited with approval in *Loren F.*). *See also CP v. Leon County School Board*, 483 F.3d 1151 (11th Cir. 2007).

Under the IDEA on appeal the court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B) (1997). Summary judgment in IDEA cases is appropriate even if there are facts in dispute, and is based on the preponderance of the evidence. *Loren F. v. Atlanta Independent School System*, 349 F.3d 1309, 1313 (11th Cir. 2003) (noting that a district court's order is more accurately described as judgment on the record). District court judges are permitted to fact find under Federal Rule of Civil Procedure 52 – "even on a record bearing evidence tendered in addition to the IDEA administrative record – subject to the requirement that they accord 'due weight' to administrative findings." *Id.* at 1313-14. The "administrative decision in an IDEA case is

entitled to due weight and the court must be careful not to substitute its judgment for that of the state educational authorities." *Walker County School District v. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000).

"[W]hether an IEP provided a 'free appropriate public education' . . . is a mixed question of fact and law subject to de novo review. Specific findings of fact are reviewed for clear error. In contract, the district court conducts an *entirely* de novo review of the ALJ's findings and has the discretion to determine the level of deference it will give to the ALJ's findings." *School Board of Collier County v. K.C.*, 285 F.3d 977, 982-83 (11th Cir. 2002) (citations omitted) (emphasis in original).

With respect to implementation of the IEP, the student must show more than de minimus failures. *See*, *e.g.*, *Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 821 (9th Cir. 2007) ("we hold that a material failure to implement an IEP violates the IDEA. A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP."); *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1027 n.3 (8th Cir. 2003) (IDEA is violated when school fails to implement "essential" element of IEP, i.e. an element "necessary for the child to receive an educational benefit"); *Houston Independent School District v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) (statute is violated only by failure to implement "substantial" or "significant" IEP provisions).

54

In order for parents to be entitled to compensation for private placement, the court must determine by a preponderance of the evidence that the school district has not made a Free Appropriate Public Education available to the student and that the private placement is appropriate. 34 C.F.R. § 300.403(c).

The court addresses first Plaintiff's arguments that the court should not defer to the findings of the Administrative Law Judge. The court then addresses the substantive arguments Plaintiff makes with respect to the adequacy of the IEP. There is some overlap between these two discussions.

### B.    Deference to the Administrative Law Judge

Plaintiff argues that the court should not defer to the rulings of the administrative law judge because he adopted Defendant's statement of facts. The court agrees that the Administrative Law Judge primarily (but not solely) adopted the chronology of facts as set forth by Defendant, but disagrees that this per se means the court should not defer to the Administrative Law Judge. The court has reviewed the statement of facts and responses made by both parties and has utilized the chronology of facts as developed by Defendant because those most closely relate to the operative issues in the appeal. The court has added in those facts proffered by Plaintiff that are relevant to the legal issues. For example, in response to Defendant's statement of facts, Plaintiff offers several comments from Mr. F's testimony concerning how B.F. felt about Ms. Novak or the Metro North program. There

is no evidence in the record, however, that Defendant knew or heard of these beliefs during the relevant time period.   For example, on cross-examination, Dr. F testified as follows:

> Q:      When B.F. was expressing to you, according to your testimony, that all of the concerns about seeing Miss Novak and restraints were resurfacing, you never told anyone at the school district court that, did you?
> A:      Actually, Miss Fantozzi and I had a conversation about associating both she and Miss Novak with Sweet Apple.
> Q:      But you never specifically told the people of the school district that he was saying that this – his memories about the restraints and so forth were resurfacing?
> A:      Not that I specifically recollect.

*See* Transcript, June 9, 2004, at 347.  From the chronology of events, it appears that Fulton County and the parents worked closely together and cooperatively until the fall of 2003. There was no information relayed to Defendant that B.F. "hated" or "feared" his experience at Metro North or was afraid of Ms. Novak.   The real crux of this case seems to be determining what went wrong in the fall of 2003 and whether it was a failure of the IEP.

Plaintiff argues that in response to subpoenas, Defendant did not turn over some documents until the date of the administrative hearing.  As the Administrative Law Judge recognized, however, there is no dispute that Georgia does not have discovery rules in administrative hearings and under Georgia procedure, certain documents did not have to be returned via subpoena to Plaintiff until the first day of the hearing.  Thus, the court will not address further any issues with respect to discovery during the administrative hearing.  The

56

court discusses below the extent to which Fulton County complied with its obligations in allowing B.F.'s parents access to documents during the school year.

Plaintiff argues that the Administrative Law Judge did not take into account the alleged admissions by Ms. Nancy Shelley, Fulton County's director of special education at the relevant time period, that the school district had not provided an adequate IEP. Plaintiff refers to Ms. Shelley's testimony concerning B.F.'s Asperger's diagnosis. The full context of Ms. Shelley's testimony shows that she testified a new diagnosis may or may not trigger the need for a new IEP and that the IEP is to look at all of the needs of the student regardless of what actual diagnosis is made. *See* Hearing Transcript, May 25, 2004, at 43 (Q: And one of the reasons one does eligibility is because the different diagnoses may impact the development of the IEP; don't you agree? A: That can be true."); *id.* ("If you're looking at the entire child, regardless of whether it is identified, you should still be able to address the needs of that individual."). Ms. Shelley further testified that "[e]ven if you didn't know a child was diagnosed with a specific label, if a child had never been given a label, you could identify his specific needs based on how he functioned." *Id.* at 43-44. Ms. Shelley testified that she believed the IEP team was meeting B.F.'s needs based on Asperger's. *Id.* at 41-42. This testimony matches precisely what the Administrative Law Judge concluded. Thus, Plaintiff's repeated reference to the Administrative Law Judge "ignoring" Ms Shelley's "admissions" is inapposite as the Judge incorporated her testimony into his ruling.

57

Similarly, Plaintiff argues that the Administrative Law Judge ignored "admissions" from Defendant's representatives, particular Ms. Shelley, concerning the status of homebound services. As the court notes below, Plaintiff's counsel was questioning Ms. Shelley on one section of the State Board rules, while another section was more applicable to B.F.'s situation. Thus, any testimony made by Ms. Shelley during that questioning is not dispositive to the relevant legal issue and cannot be deemed an "admission" of obligation on the part of Fulton County.

Plaintiff argues that the Administrative Law Judge "ignored" testimony from Ms. Pettes and Ms. Novak concerning whether the IEP focused only on social and behavioral issues or whether it contained academic goals as well. *See* PSMF, ¶ 56 & extensive footnote 18. Plaintiff claims this testimony alone is sufficient to warrant a *de novo* review of the Administrative Law Judge's order. The court disagrees. As an initial matter, as the court discusses below, it is not the testimony of any representatives of Fulton County which determines whether a student has received a Free Appropriate Public Education; the court does that. As to the factual matter of what is contained within B.F.'s IEP, there is no question that it focused on behavioral, social, and organizational skills. However, part of the goal of the program was to allow B.F. to attend regular education classes with his peers and on his own. Thus, the organizational goals in the IEP – understanding and documenting assignments, being able to locate assignments and homework, using the agendas – are

intertwined with his work in the regular education academic classes. The court finds

nothing remarkable in the cited testimony of Ms. Pettes and Ms. Novak other than to state

that they were focused on improving B.F.'s social and behavioral functioning. The court

finds that B.F.'s academic progress is at least one component of evaluating his social and

behavioral function. The court does not agree that no deference should be given to the

Administrative Law Judge because he considered academics as one component in whether

B.F. was receiving "educational benefit" from the program Fulton County was providing.

Plaintiff further contends that the Administrative Law Judge did not address certain

issues, such as: whether the IEP was implemented on a timely basis; burden of proof;

sufficiency of the eligibility information for B.F.'s disabilities; whether the related services

in the IEP were sufficient in scope; access to B.F.'s records; inadequacy of the Behavioral

Intervention Plan; whether the program provided for B.F.'s safety after his suicidal

ideations; whether the "hostility" of the school district adversely impacted the services it

provided;[7] and whether Fulton County breached its agreements with the family or violated

---

[7]Plaintiff asserts that the hostility of a school district to a family is relevant to a determination of Free and Appropriate Public Education. Plaintiff cites *Board of Education of Community Consolidated Schools v. Illinois State Board of Education*, 938 F.2d 712, 714, 718 (7th Cir. 1991), and *Greenbush School Committee v. Mr. & Mrs. K.*, 949 F. Supp. 934 (D. Maine 1996), for this proposition. The court disagrees. Both cases hold that a court may consider *parental* hostility to a placement in determining whether the placement would be appropriate and of educational benefit to the child. Here, the court finds that there was sufficient hostility to go around and the appropriate focus is on whether B.F. could receive any educational benefit in attending Elkins Pointe.

59

the IEP. The court notes that in his order, the Administrative Law Judge specifically addressed timely implementation, eligibility information for B.F.'s disabilities, access to B.F.'s records, the adequacy of the Behavioral Intervention Plan; and the adequacy of the IEP.[8] Thus, with respect to these issues, Plaintiffs are simply incorrect that the Judge never addressed them. The burden of proof issue was (at the time of the administrative hearing) uncertain under federal law. As the court noted above, the Supreme Court determined in 2005 that the burden of proof rests with the party seeking relief. The Administrative Law Judge did not address whether it was proper for B.F. to have an aide and an occupational therapist lead his studies skills class and did not address whether the program for B.F.'s safety after his suicidal ideation was sufficient. The court will address those issues below. The fact that the Administrative Law Judge did not touch upon these two issues out of the myriad raised by the parties in this litigation, however, does not cause the court to exercise its discretion to remove deference from the Administrative Law Judge.

Finally, the court notes that while it has undertaken an extensive independent review of the record and the parties' statement of facts and response, themselves totaling over 250 pages, it is the Administrative Law Judge who saw first hand the testimony of many witnesses (others provided testimony in a written form). The court finds that particularly in this case where a great deal of the conflict arose from communication and personality

---

[8]The court finds no legal significance to Plaintiff's assertion that Fulton County "breached agreements with the Family."

issues, viewing witness testimony is of even greater significance than it might otherwise be, and is an important reason to grant deference to the fact finder who viewed the entirety of the testimony.

For the foregoing reasons, the court gives deference to the findings and the holdings of the Administrative Law Judge and addresses certain other issues raised by Plaintiff as a matter of elaboration.

## C.    Adequacy of IEP[9]

---

[9]In their response to Defendant's motion for summary judgment, Plaintiffs raise certain issues of the adequacy of the IEP for the first time. For example, Plaintiffs claim that B.F.'s IEP was not adequate because it did not contain an assistive technology plan to accommodate B.F.'s difficulties with handwriting. This is factually incorrect. In years past, B.F. received an AlphaSmart computer to assist him in taking classroom notes and writing down homework assignments. For the 2003-2004 school year, with his parents' agreement and consultation with Fulton County's assistive technology specialist, B.F. was given a laptop.

Furthermore, Plaintiffs passingly argue that B.F.'s teachers were not properly qualified. There is no dispute that B.F.'s regular education teachers met the Georgia certification requirements for their academic subjects. B.F.'s two special education teachers were certified in Interrelated Special Education by the Georgia Professional Standards Commission. Ms. Novak had a special education certificate in Behavior Disorders and Supervision. Ms. Patel was licensed as a speech language pathologist by the State of Georgia.

AO 72A
(Rev.8/82)

1.     Behavioral Intervention Plan

The court disagrees with Plaintiff's assertion that the document outlining Fulton County's Special Education Services (P3) requires that a Functional Behavioral Assessment ("FBA") must be completed for a behavioral intervention plan. PSMF, ¶ 87. That document defines both terms but does not cross-reference them, nor does the document impose any obligations on the part of Fulton County.

The court further disagrees that Ms. Shelley testified that the IEP manual rules required the provision of a finished Behavioral Intervention Plan as part of the IEP. *See* Plaintiff's Mot. S.J., at 22-23. Review of Ms. Shelley's testimony on the cited pages shows that inclusion of the Behavioral Intervention Plan depends on the nature of the student. In any event, as the Administrative Law Judge set forth, there is no dispute that Fulton County proposed a Behavioral Intervention Plan to B.F.'s parents at the beginning of September, albeit several weeks after the beginning of the school year. To the extent that this renders the proposed plan untimely, the court finds Plaintiff has not established any harm from this delay due to medical issues of a Fulton County staff member. B.F.'s parents rejected the proposed plan and informed the school district that they would be providing input after they consulted with their private psychologists. The school district never received any suggested alterations to the proposed plan. As the Administrative Law Judge found – and this court finds no reason not to credit – the parents' claim that a November 2003 letter from Parkaire

62

Consultants constituted the revisions is without merit as that letter did not reference a Behavioral Intervention Plan. Thus, as the Judge correctly found, the failure to come to a resolution on the Behavioral Intervention Plan rests partially with the actions of the parents.

2.   Asperger's Diagnosis

As the court stated above, Ms. Shelley's testimony does ***not*** establish that Fulton County was required to issue a new IEP after receiving B.F.'s diagnosis of Asperger's Syndrome. Rather, Ms. Shelley testified that the IEP had to be based on the skills, needs, and functioning of the student, regardless of specific diagnosis. The IEP and specifically the goals and objectives related to B.F.'s behavior and social interaction are substantially similar to those provided by Dr. Platzman, B.F.'s private psychologist. Thus, the court finds no relevance to the fact that Fulton County did not prepare a new IEP upon learning of B.F.'s diagnosis of Asperger's Syndrom.

3.   Academic Progress in Light of Behavioral Problems

Plaintiff argues that the Administrative Law Judge placed too much emphasis on the academic progress of B.F. and ignored the continued behavioral problems. The court finds, however, that while B.F.'s IEP placed emphasis on behavioral issues, his progress in the academic classroom is one means of evaluating success on the behavioral front.

Plaintiff asserts that Defendant's representatives testified that B.F.'s Free Appropriate Public Education was measured by behavior and not academics. PSMF, ¶ 13. The court

determines whether B.F. received Free Appropriate Public Education. Further, it is clear from reading B.F.'s IEP that behavior, organization, and social skills were a major focus of goals for B.F. However, as the court stated above, that does not render B.F.'s academic success irrelevant to a determination of whether his IEP was providing him with educational benefit.

By the fall of 2003, B.F. attended mainstream classes for all of his classes as well as home room and physical education. His science and social studies classes were team taught with special education teachers. The fact that he received high grades in these classes is relevant to determining whether B.F.'s IEPs were providing educational benefit. As the court found in *C.J.N. v. Minneapolis Public Schools*, 323 F.3d 630 (8th Cir. 2003), where a student has a complicated history of psychiatrist problems, academic progress is "even more relevant to the educational benefit inquiry, because it demonstrates that his IEPs were not only reasonably calculated to provide educational benefit, but, at least in part, did so as well." *Id.* at 638. Other courts have also recognized that it is appropriate to consider academic progress in a student with severe behavioral problems as one means of determining whether he is receiving educational benefit. *See*, *e.g.*, *Adam J. v. Keller Independent School District*, 328 F.3d 804 (5th Cir. 2003); and *Kings Local School District Board of Education v. Zelazny*, 325 F.3d 724 (6th Cir. 2003).

AO 72A
(Rev.8/82)

Finally, Plaintiff argues that because B.F. continued to have behavioral and social problems in the fall of 2003, the school's IEP must have been inadequate. That, of course, is not the full measure of an IEP. A school district is not required to cure a student of his ailments. The school is required to work with those conditions so that a student receives a Free Appropriate Public Education. The court has reviewed the testimony of B.F.'s teachers during the administrative hearing. What that testimony reveals is a complex situation where B.F. would have good days and bad days. At times, the teachers certainly expressed frustration with the situation and B.F.'s behavior, but they also testified that B.F. was capable of and was, in fact, keeping up with his nondisabled peers in academic subject areas. There is no doubt that B.F.'s progress required an enormous amount of effort on the part of B.F., his parents, his teachers, staff and aides, but that as the Administrative Law Judge found, B.F. was making progress.

### 4. Homebound Services

Ms. Shelley did testify at the administrative hearing that Fulton County will provide homebound services when a physician signs a note. *See* Hearing Transcript, May 25, 2004, at 109-10; PSMF, ¶ 70. The court, however, does not find this an "admission" by Defendant as this is a matter of legal interpretation of a State Board rule. The court determines whether that rule is applicable in the circumstances of this case.

AO 72A
(Rev.8/82)

Section 160-4-2.31 Hospital/Homebound Instruction provides that:

> (2)     Requirements
>
> (a)     The local school system shall provide hospital/homebound instruction to students, including students with disabilities, who meet the following eligibility requirements:
>
> (1)     Receipt by the local school system of a completed medical referral form signed by a physician . . . stating that it is anticipated the student who is able to participate in educational instruction will be absent a minimum of 10 consecutive school days or that the student has a chronic health condition causing him or her to be absent for intermittent periods of time, i.e., of greater than, equal to, or less than 10 days on each occasion during the school year.

*Id.*  This section does have the mandatory "shall" language that Plaintiff's counsel questioning Ms. Shelley about during the administrative hearing.  Plaintiff's counsel, however, fails to point out that the section goes on to provide:

> (h)     Students with absences due to psychiatric/emotional disorders, as defined in the latest edition of the *Diagnostic and Statistical Manual* (DSM), may be eligible for hospital-homebound instruction.  In addition, such students shall be referred to the student support team for assistance.

*Id.*

It seems clear to the court that subsection (a) and (a)(1) deals with physical medical issues, while the more specific subsection (h) deals with psychiatric/emotional diagnoses, which would apply to B.F.'s situation.  Subsection (h) clearly has the non-mandatory "may" language.  As the school noted in its correspondence with B.F.'s parents, it served students

with Asperger's syndrome in school and needed more than simply this diagnosis as justification for the provision of homebound services, particularly where B.F.'s psychiatrists were noting that B.F. could attend school under certain conditions. Thus, Defendant did not violate B.F.'s rights under the IDEA in refusing to provide homebound services after March 15, 2004.

5.   <u>Return to School</u>

Plaintiff argues that Fulton County failed to provide adequate assistance in regard to B.F.'s suicide attempts or in developing a safety plan upon B.F.'s return to school. *See* Plaintiff's Mot. S.J., at 24.[10] There is no reasonable review of the record in this case that could come to this conclusion. As the facts developed above show, on the day of B.F.'s suicidal ideation, it was Ms. Fantozzi who stayed with B.F. and continued to speak with him enough to become concerned about his safety and his statements about suicide. She immediately recognized the gravity of the situation and contacted B.F.'s parents. Over the winter break, there were numerous communications between B.F.'s parents, his doctors, and the school staff to develop a safety plan for B.F.'s return to school. B.F.'s doctors agreed that he could return to school under certain conditions. The school district agreed to those conditions, such as eyesight supervision (despite the fact that not all of B.F.'s doctors

---

[10]The court notes that this is not specifically a part of B.F.'s IEP.

believed he needed constant supervision)[11] and only one aide during the school day.  The parents did not agree with the school's selection of the aide, Ms. Bouldin.

It is true that Ms. Fantozzi did not accompany B.F. to the cafeteria on the second day of his return to school in March as she was attempted to straighten out a scheduling issue.  However, Ms. Cohn, B.F.'s special education teacher, saw B.F. leave the cafeteria and immediately addressed the situation.  When B.F. would not answer her questions, Ms. Cohn went for help and school staff began to assist B.F. and spoke with cafeteria personnel so they would know that B.F. could sit with his friends.  While it certainly would have been better for B.F. not to have the misunderstanding in the cafeteria, the situation was immediately addressed by staff and by all staff testimony, B.F. was not in emotional crisis over the situation.  It appears that it was Mr. F's decision to remove B.F. from school that day upon learning that Ms. Novak was involved in the situation, not due to any failure of a safety plan.

---

[11]*See* Transcript, June 9, 2004, at 353-54 (Dr. F's testimony) (Q: And I'd like for you to turn to the second page of the letter . . . .  And Dr. Lau[t]er, who was the psychiatrist to whom B.F. had been now going, states at the last sentence of that paragraph that is continuing from the first page, that he doesn't need to be within eyesight at all times, does he?  Isn't that what he states? . . . A: The letter does say that, and I discussed that with Dr. Lau[t]er before the letter was written.  And we had particularly talked in terms of B.F. having to be within eyesight in the bathroom that that needed to just be clear to everybody that while we meant for him to have very close watch, it didn't mean somebody had to follow him and watch him use the restroom.").

6.     Other Issues

Plaintiffs allege that B.F. did not receive the .1 hour per month of consultative services from the occupational therapist and assert that "six minutes" is facially inadequate. In fact, the record demonstrates that the .1 hour per month of consultative services would be done on a twice a semester basis. *See* R.40, at 222, 250. Lori Henrickson documented that she did consult with B.F. and B.F.'s teachers. *See* P260, at 2 (listing consultations on August 29, 2003; September 18, 2003; and two other occasions with illegible dates. *See also* R59, dated January 5, 2004, from Ms. Henrickson stating that B.F. had been receiving consultative services twice per semester, working with B.F. on hand development activities and B.F.'s teachers on sensory issues. It further states that B.F. would continue to receive occupational therapy in the coming semester. *Id.* Thus, the court finds that B.F. did receive the occupational therapy services outlined in his IEP.

B.F. also asserts that his IEP did not have measurable annual goals and what goals it did set forth were not appropriate. The primary citation for this argument is the testimony of Ms. Cohn, one of B.F.'s special education teachers. However, as the court described above in the factual recitation, the portion of the goals with which Ms. Cohn disagreed was the lack of benchmarks to push B.F. to independence from his aides. For example, Ms. Cohn felt that B.F. should be required to note his assignments for each class. B.F.'s parents, however, opposed this and it was never implemented. Therefore, the court does not take Ms.

Cohn's testimony about the inappropriateness of some goals in the IEP as a matter for the school's responsibility. Ms. Cohn was disagreeing with the parents' view of what B.F. should be required to do. With respect to the measurability and objectives of the goals upon which all parties agreed at the IEP meeting, the court notes that the parents never raised questions about the measurability of the goals and objectives set forth in the IEP. The parents' concerns rested primarily with the staffing of B.F.'s case. The court further notes that the practical behavioral and social skills that Ms. Patel, B.F.'s speech therapist worked on with B.F. certainly had measurable goals and objectives. Ms. Patel would work with B.F. individually and role play appropriate conversation patterns. She would then observe B.F. in the cafeteria interacting with his peers and reviews those situations with B.F. during their speech therapy sessions. These are precisely the types of activities that B.F.'s own doctors were recommending.

7.    Summary

The court reviewed a lengthy analysis of the facts in this case to show that either in part or in a cumulative view, this was not a situation were the school district ignored the needs of a disabled child. Rather, the record is replete with meetings, consultations, telephone calls, and e-mails, a myriad of communication among educators and B.F.'s parents. It is clear that in the fall of 2003, B.F.'s parents and B.F.'s educators began to disagree over the best course of action for B.F. and the lines of communication began to

70

break down.  Disagreement over goals, however, does not equate to a failure of an IEP to give educational benefit or of the district to provide a Free Appropriate Public Education. At the time of B.F.'s crises in the fall of 2003, no one had informed the district of any hatred B.F. had for Ms. Novak.  B.F.'s parents simply demanded that she be removed from B.F.'s case, as they had demanded a change in aide for B.F. throughout his experience with the Fulton County system.  The school district, however, is not required to accede to every demand made by parents in order to be deemed in compliance with the IDEA.  The court finds telling Mr. F's statement that he was not "willing to be dictated to, pushed aside, or cut out of the loop."  Dr. Lauter testified along similar lines in his supplemental deposition stating that by 2005 "it was quite clear that we would never have any say-so in terms of who actually ran the program at Elkins Pointe."  Lauter, Dec. 21, 2007, at 31.  The court finds this pattern continued when B.F.'s parents expected the school district to provide hospital/homebound services without giving the school district any justification for the request.  The IEP process is to be collaborative; it is not to be under the sole control of the parents, particularly when it comes to staffing and instructional issues.  The court notes in particular that Dr. Lauter's declaration that B.F. suffered from Post Traumatic Stress Disorder did not come until March 2004, and only after Fulton County showed its unwillingness on numerous occasions to agree to the parents' demands that Ms. Novak be removed as B.F.'s case manager and Ms. Fantozzi be B.F.'s only aide for the full day.

71

The court reviewed the extensive history of B.F.'s experience to demonstrate that there was successful cooperation between the parents and the district prior to the 2003-04 school year. This cooperation included working with Ms. Novak at Sweet Apple Elementary School and the parents expressed no dissatisfaction with Ms. Novak at the time. For whatever reason – it appears to the court that B.F.'s parents were particularly displeased with the removal of Mr. Reitz as B.F.'s case manager and Ms. Novak's attempts to structure communication between the parents and school staff – the relationship among the members of the IEP team deteriorated in the fall of 2003. The court's review of the record demonstrates two main areas of disagreement: (1) the parents wanted Ms. Novak removed as case manager and (2) the parents wanted only Ms. Fantozzi to be B.F.'s assistant because they found every other assistant who worked with B.F. to be incompetent. While in this due process setting and in the litigation, the parents had raised a host of other problems with the IEP and the services provided by the school, these two areas are really the crux of the problem. The court has found no provision in the IDEA which would allow parents to direct the particular individuals who will provide services to their child.

Over the winter break at the beginning of 2004, B.F.'s treating psychiatrists for the first time did specifically state that B.F. was having difficulties with Ms. Novak. It is only at this point that there is an arguable basis for considering whether Ms. Novak should have remained involved in B.F.'s case. The school district's position is that B.F.'s parents made

72

the determination that they did not want to work with Ms. Novak before B.F.'s treating physicians offered an opinion on the subject and the parents made their feelings on the subject known to B.F. such that B.F. and the parents reported to the treating psychiatrists that Ms. Novak was a source of fear and anxiety for B.F. The court is not going to attempt to unravel that knot but to state that the court finds it significant that in his March 2004 memo, Dr. Lauter did not simply say that B.F. was suffering from a type of Post Traumatic Stress Disorder with respect to Ms. Novak and thus could not work with her, but he went further to state that B.F.'s parents should not have to work with her either. Even crediting Dr. Lauter's professional opinion that interaction with Ms. Novak would be emotionally harmful to B.F., there is no basis in the record to show that interaction with Ms. Novak could be somehow physically or emotionally harmful to B.F.'s parents. The fact that Dr. Lauter would extend his opinion to cover not only B.F., but also B.F.'s parents would tend to lend credence to the school's viewpoint that B.F.'s parents were the primary source of problems with Ms. Novak.

The court further notes that during the 2003-04 school year, Ms. Novak was acting only in an administrative capacity with respect to B.F. She testified that she saw him only seven times during the course of the fall semester. In other words, she was not taking an active role in B.F.'s education on a day-to-day basis, although she certainly was with respect to B.F.'s parents. The court further takes from the record the fact that despite all of the

73

problems they believed that B.F. had at Elkins Pointe Elementary School and the Metro North program run from that school, B.F.'s parents continued to request from Fulton County a medical hardship to allow B.F. to attend school at Elkins Pointe which was outside of his district. Thus, even if the school had acceded to the parents' request to have Ms. Novak removed as case manager, B.F. would still have attended Elkins Pointe, would still have been exposed to the Metro North facility, and would still have seen Ms. Novak at the school, if on a random basis only.[12] Finally, the court notes that the parents' labeling of Ms. Novak's efforts in helping to locate B.F. on the day in March when he left the cafeteria as "child abuse" and demanding a referral to the Department of Children and Family Services for investigation strikes the court as perhaps indicative of a certain lack of perspective with respect to her role.

In their proposed findings of fact and conclusions of law, Plaintiffs ask the court to find that Elkins Pointe was not an appropriate place to educate B.F. and that with a system as large as Fulton County, the district court have placed B.F. elsewhere. PSMF, ¶ 102. This finding seems in conflict with any other statement made by Plaintiffs during the course of the litigation (until Dr. Lauter's supplemental deposition) and was a request never made by the parents during the 2003-04 school year.

---

[12]In his December 21, 2007 deposition, Dr. Lauter does state that he later – around 2005 – came to the conclusion that B.F. could never return to Elkins Pointe Middle School because of the trauma it would cause him. *See id.*, at 33. Thus, it appears that even what the parents were requesting would not have aided B.F.

The intent of the IDEA is not to endow the court with the skills of a special education office and decide whether the parents' preferred program is more beneficial than the school's preferred program. In fact, the Eleventh Circuit has determined that the court should give great deference to the educators involved in developing the student's IEP. The court cannot say as a matter of law that the educators here were wrong and B.F.'s parents were right, particularly where the private psychologists retained by B.F.'s parents seemed to have conflicting views of his needs. The court can say, however, that the school district did provide a "basic floor of opportunity" for B.F. B.F. was progressing academically. His aides were working with him to develop techniques to address his anxiety. It is clear that B.F. continued to have problems with his anxiety and these problems lead directly to the crisis in the school cafeteria and upon his return to school in the spring. Again, the fact that the program was not 100% successful does not render it a failure to provide Free Appropriate Public Education. The court finds that this is not a situation where the school was ignoring the requests of the parents or the needs of the student.[13] Rather, at every turn,

----

[13]In their summary judgment brief, Plaintiffs repeatedly argue that the school district ignored problems and their demands concerning B.F.'s education. A careful review of the record, however, demonstrates quite the opposite. For example, the school district agreed to nearly all of the twenty-two accommodations B.F.'s parents demanded during one meeting in the fall of 2003. It is true that the school district refused to remove Ms. Novak as B.F.'s case manager and refused to provide him with Ms. Fantozzi as his one aide during the day. This hardly constitutes ignoring the parents' requests or the problems B.F. continued to have. The school and the parents clearly disagreed on these issues. A disagreement, however, does not constitute a failure to provide a Free and Appropriate Public Education.

AO 72A
(Rev.8/82)

in response to comments, complaints, and suggestions by the parents, the school repeatedly adjusted the IEP, B.F.'s learning program, and the services to be provided to B.F. The parents may have desired different changes, (i.e. that particular staff members work with B.F.), but the IDEA is not a guarantee to the parents of the satisfaction of their preferences. It does require that the school district meet the "basic floor of opportunity" and provide an educational benefit. The court finds the school did so.

The court does not discount the concern of the parents, nor the fact that the parents obviously had the best interest of their child at heart and spent an enormous amount of time working with the school and B.F. to achieve success. The court rather finds that the school district made its best efforts to accommodate the desires of the parents and the skills and abilities of the student. These efforts turned out to not be satisfactory for the parents, but that does not mean the efforts fell below that required by the IDEA.

For the foregoing reasons, the court finds that Plaintiff has not met its burden of proof of establishing that the school district failed to provide B.F. with Free Appropriate Public Education and GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's motion for judgment. In the alternative, however, the court goes on to consider whether B.F.'s placement in the Lionheart School was appropriate so as to entitle him to reimbursement under the IDEA.

**D.     Appropriateness of Private Placement**

Even if a court determines that a student has not received a Free and Appropriate Public Education, in order to receive reimbursement for private placement, the student must demonstrate that the placement was appropriate to meet his needs. *See* 20 U.S.C. § 1412(a)(10)(C). The private placement must be "reasonably calculated to enable the child to receive educational benefits." *See Florence County School District Four v. Carter*, 510 U.S. 7, 11 (1993). A private placement's failure to meet the IDEA's requirements does not per se mean it is inappropriate. *Id.* at 13. However, the least restrictive environment requirement of the IDEA "remains a consideration that bears upon a parent's choice of an alternative placement and may be considered by the hearing officer in determining whether the placement was appropriate." *See M.S. v. Yonkers Board of Education*, 231 F.3d 96, 105 (2d Cir. 2000), *abrogated on other grounds*, *Schaffer v. Weast*, 546 U.S. 49 (2005).

In *W.C. v. Cobb County School District*, 407 F. Supp. 2d 1351 (N.D. Ga. 2005) (Thrash, J.), this court held that the student did not meet his burden of demonstrating that placement in the Lionheart School was appropriate. *Id.* at 1262-63. The court found that placement in the Lionheart School was more restrictive than the placement provided by the School District and provided the student with no opportunity to receive education with non-disabled peers. *Id.* There was no indication that the placement would eventually transition into a less restrictive environment because the school had not attempted to transition any of its middle or high school students into a different environment. *Id.* While "mainstreaming"

is not required, the IDEA maintains a strong preference for it. *Id.* (citing 20 U.S.C. § 1412(a)(5); *Rowley*, 458 U.S. at 202-03).

The court also considered the fact that (1) none of the student's teachers had teaching certificates, (2) the school had only been in existence for one year and had no proven track record, (3) the student had not provided any documentary evidence of his program at the school, and (4) the Lionheart School's education methods were untested and unvalidated, "contrary both to the federal government's stated educational preference and the program at the [student's] former, state-funded school." *Id.* at 1363.

The court recognizes that Dr. Platzman and Dr. Lauter both believed that the Lionheart School was an appropriate placement for B.F. This may not be surprising in light of the fact that at the time, both acted as consultants for the school. *See* Plaintiff's Exh. 192, at 490 (listing Dr. Kathy Platzman and Dr. Jonathan Lauter as consultants). However, their testimony is not sufficient to carry the parents' burden of demonstrating that placement at Lionheart was "appropriate."[14] The court notes that B.F.'s parents, themselves, removed B.F. from the Lionheart School and shifted him to the Chrysalis School. This would seem

---

[14]The court notes additionally that Dr. Lauter testified in his December 2007 deposition that B.F. no longer attended the Lionheart School. The parents have proffered no information about B.F.'s current placement and therefore, in the alternative, B.F.'s parents cannot demonstrate that any placement for the 2005-06 school year and thereafter was "appropriate." Moreover, as Defendant points out, Plaintiff delayed the case for more than a year after their August 2, 2006 motion for a continuance. This action also counsels against the reimbursement of any private placement during that time of delay.

AO 72A
(Rev.8/82)

to be further evidence of the inadequacy of the Lionheart School's program to suit the needs of B.F. For these reasons, the court agrees that Plaintiff is not entitled to reimbursement of the costs of a private placement that was not appropriate.

### E. Rehabilitation Act

Plaintiff claims that Defendant's failure to provide a Free and Appropriate Public Education constitutes discrimination against him under section 504 of the Vocational Rehabilitation Act, codified at 29 U.S.C. § 794(a). Section 504 provides: "No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *Id.* A plaintiff alleging disparate treatment and seeking compensatory damages must demonstrate intentional discrimination or bad faith. *See Wood v. President & Trustees of Spring Hill College*, 978 F.2d 1214, 1219 (11th Cir. 1992). B.F. alleged in his complaint that Defendant violated his rights under Section 504 "to a free and appropriate public education in the least restrictive environment possible that does not discriminate against him based on his disability." *See* Cmplt., ¶ 96. Plaintiffs have not alleged any facts to show intentional discrimination, nor have they alleged any facts which would constitute more than an IDEA violation. *See* Plaintiff's Resp., at 65 (stating basis for Section 504 claim was (1) need for accommodation as autistic child; (2) right to receive homebound services as an accommodation to his

79

disability; (3) right to receive continued instruction at home; (4) right to remove Ms. Novak as case manager and have only one aide).

Furthermore, other circuits have specifically held that to set forth a claim under section 504 in the education context, a plaintiff must do more than show just an IDEA violation for failure to provide a Free Appropriate Public Education. *See, e.g., Mark H. v. Lemahieu*, 513 F.3d 922 (9th Cir. 2008) (holding that availability of relief under IDEA would not limit availability of damages remedy under the Rehabilitation Act but something more than mere failure to provide Free Appropriate Public Education must be shown); *N.L. v. Knox County Schools*, 315 F.3d 688, 695 (6th Cir. 2003); *Sellers v. School Board of the City of Manassas*, 141 F.3d 524, 529 (4th Cir. 1998). Rather, a plaintiff must show that the school engaged in bad faith or gross mismanagement or that he was discriminated against solely because of his disability. *See W.C. v. Cobb County School District*, 407 F. Supp. 2d 1351, 1363-64 (N.D. Ga. 2005) (Thrash, J.). The court finds that Plaintiff has not done so here and therefore, the court grants Defendant's motion for summary judgment as to Plaintiff's Rehabilitation Act claim.

## F.    Section 1983

Plaintiff did not respond to Defendant's motion for summary judgment as to his § 1983 claims and the court deems those claims abandoned. *See Resolution Trust Corp. v.*

AO 72A
(Rev.8/82)

*Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned").

## III. Conclusion

The court GRANTS Defendant's motion for leave to file excess pages [74]; GRANTS Defendant's motion for summary judgment [75]; GRANTS Plaintiff's motion for leave to file excess pages [76]; DENIES Plaintiff's motion for summary judgment [77]; DENIES Plaintiff's motion for judgment [78]; DENIES AS MOOT the parties' joint motion for clarification [79]; GRANTS Plaintiff's motion for leave to file excess pages [82]; GRANTS Defendant's motion for leave to file excess pages [83]; and GRANTS Defendant's motion for leave to file excess pages [85].

**IT IS SO ORDERED** this 9th day of September 2008.


           _____s/ J. Owen Forrester_____
                 J. OWEN FORRESTER
        SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)